(No. 51989.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EUGENE A. WALKER, JR., Appellant.

*Opinion filed April 17, 1981.*

RYAN, J., concurring in the decision.
MORAN, UNDERWOOD and WARD, JJ., dissenting.

John H. Reid, Deputy Defender, and Robert E. Davison and Randy E. Blue, of the Office of the State Appellate Defender, of Mt. Vernon, for appellant.

William J. Scott, Attorney General, of Springfield (Donald B. Mackay, Melbourne A. Noel, Jr., and Orisha A. Kulick, Assistant Attorneys General, of Chicago, of counsel), for the People.

MR. JUSTICE CLARK delivered the decision of the court and the following opinion in which MR. CHIEF JUSTICE GOLDENHERSH and MR. JUSTICE SIMON join:

This capital case presents questions involving the permissible reach of prosecutorial discretion under the due process clause of the United States Constitution and the appropriateness of the penalty of death for this defendant under the eighth amendment of the Constitution and Illinois law. For the reasons which follow, we consider only the former issue. The defendant initially pleaded guilty in the circuit court of St. Clair County to indictment counts of murder, attempted murder, armed robbery, and armed violence, pursuant to a plea bargain under which, *inter alia*, the defendant would receive a sentence of 60 years in the penitentiary. A subsequent motion to vacate this plea was granted, but when the case proceeded to trial, defendant entered an unnegotiated plea of guilty. A sentencing hearing was held before the court, and

defendant was sentenced to death. This appeal followed. See 73 Ill. 2d R. 603.

Defendant Walker and Paul Bainter were jointly indicted on June 18, 1978, for murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)), armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2(a)), armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2), conspiracy to commit armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 8—2(a)), and four counts of attempted murder (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(a)). The defendant originally entered a not guilty plea, and the St. Clair public defender was appointed to represent him.

The public defender's unopposed motion for a psychiatric examination of defendant to determine his competency to stand trial and his sanity at the time of the offense based upon his "long history of mental and psychiatric problems" was granted on June 27, 1978. The report and an addendum to the report filed by the court-appointed psychiatrist on July 18, 1978, and September 7, 1978, respectively, contained conclusions that defendant was competent to stand trial and was sane at the time of the crimes, but noted defendant's past history of drug and alcohol abuse and defendant's "dull normal intelligence." Defendant obtained a new attorney on August 8, and the case was set for trial on October 2, 1978.

Defendant's counsel and the State's Attorney concluded a plea bargain in which the defendant pleaded guilty to each charge except the one charging conspiracy, which the State agreed to drop. The State also agreed to recommend a 60-year prison term for murder and other sentences for concurrent terms which are not relevant here.

On October 2, the court explained the terms of the indictment but inaccurately advised the defendant of the maximum penalties which could be imposed for his crimes. The court twice told defendant that "[t]he range of

sentencing could be 40 to 80 years," whereas the indictment's terms, alleging murder and armed robbery, justified a death sentence hearing. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6); *People v. Brownell* (1980), 79 Ill. 2d 508, 524-25.) The State's Attorney took a leading role in these proceedings, advising the court of the sanction possibilities for several indictment counts, and did not challenge the court admonitions on the murder count. Thus these proceedings did not comply with our Rule 402. (73 Ill. 2d R. 402(a)(2).) (The importance of Rule 402 was evidenced at this hearing. When the trial court informed defendant that the offense of murder carried with it a possible $10,000 fine, defendant answered: "I'd like to state this is the first time I heard that." This fact, however, did not result in defendant changing his decision to plead guilty.) The court proceeded to inform defendant of the constitutional rights he was waiving by pleading guilty and attempted to ascertain whether his plea was knowing, voluntary and intelligent.

Defendant's counsel set forth the factual basis for the plea. Near the end of the proceeding defendant interjected his concept of what the plea represented:

> "THE DEFENDANT: I'd like to say that even though the facts of all this points against me, it's more or less finding me guilty that I have no knowledge that I actually committed these crimes, and even though I have pleaded guilty I cannot say that I am guilty."

The defendant's attorney then, with the court's permission, questioned the defendant:

> "Q. Eugene, I think what you are trying to say is that you don't recall after you went up into the cafe, isn't that right? You don't recall anything that took place after that?
> A. Yes.
> Q. Correct?
> A. That's correct.
> Q. You're not saying you weren't there?

A. No.

Q. You remember being there, don't you?

A. I remember being there.

Q. And you remember having the gun and having the green Army fatigue jacket on, don't you?

A. Yes.

Q. What you are saying to the Court is what I had stated earlier, are you not, that you simply don't recall firing the gun or killing, specifically, at Mrs. Wallace or any of the other people?

A. Yes.

Q. Okay.

THE COURT: Mr. Walker, you understand that you are admitting here today though that you did all those things the State said you did?

THE DEFENDANT: Yes.

Q. Your Honor, I think its's a problem in that this young man, I believe him, honestly does not recall firing the gun. And I think that's the point he was trying to make to the Court.

THE COURT: Is that correct, Mr. Walker?

A. That is correct."

The plea was then entered. The court agreed to accept the plea as negotiated but apparently did not formally enter the sentence, for the case was ordered continued pending the receipt of a presentence report. (See Ill. Rev. Stat. 1977, ch. 38, par. 1005–3–1.) Therefore, the admonitions in Rule 605(b) (73 Ill. 2d R. 605(b)) were never given.

Ten days after these proceedings were concluded (see 73 Ill. 2d R. 604(d)), defendant, in a handwritten, notarized letter, asked the trial judge to withdraw his plea of guilty, alleging that he was mentally incompetent, did not understand the full consequences of his original guilty plea and intended to plead not guilty on the basis of mental incompetency. On November 20, defendant appeared in court with his counsel. Counsel, without giving reasons, stated that defendant's motion to vacate the plea was against his advice. Defendant stated that he neverthe-

less desired to present the motion and dismiss his attorney. The court appointed the public defender to assist defendant in petitioning for a plea withdrawal.

The motion filed alleged various errors in advising the defendant which tended to show that he did not plead guilty knowingly, voluntarily and intelligently. This motion was argued on December 7. Defendant testified that both of his attorneys only consulted him briefly and that he was not fully advised prior to the plea that he would have to serve 30 years in jail under the bargain's terms. In addition, defendant said he was "very depressed" and "very nervous" and "very confused" during the negotiation process and at the time of the entry of the plea. The State's Attorney cross-examined the defendant about his reasons for changing his mind, his original decisional process and about the bargain itself:

> "Q. And you knew at the outset what the State was going to recommend in exchange for you withdrawing your not guilty plea and entering a guilty plea, didn't you, the term of years, the time that you would have to spend in jail?
> A. Yes.
> Q. As part of that, we— you knew also that the death penalty was not going to be sought, didn't you, you would be going to jail rather than looking at a potential death penalty; didn't you?
> A. Yes."

Defense counsel, however, argued in pertinent part to the court that "[t]he court has seen Mr. Walker testify here in this proceeding and the court can judge his mental state, his ability to understand, the possibility that he could be confused. He was very easily confused here today by [the State's Attorney]. The court has also examined the psychiatric report, which shows his borderline level of retardation." Although counsel did not explain which answers, out of those which were asked, he deemed a product of defendant's confusion, this argument was unre-

butted. The court granted defendant's motion.

The trial court was also informed that defendant had arranged for private counsel, who represented defendant for approximately one month before withdrawing, on January 8, 1979, "for professional reasons." The court, being advised that defendant was impecunious, appointed a new attorney to represent him.

This attorney filed a petition for a psychiatric examination on January 31, 1979. This petition alleged that defendant's mental capacity to assist in preparing a defense was suspect, that he was not cooperating in preparing a defense and "that the defendant failed to understand and comprehend that the nature of the charges against him may ultimately lead to a death sentence and refuses to discuss same with counsel." This petition was unopposed and the motion was granted.

The psychiatric report was prepared by a new psychiatrist. It paralleled the earlier report.

On the date this case was set for trial, February 6, 1979, the defendant, before a new judge, entered an unnegotiated plea of guilty to each indictment count. The trial court admonished the defendant in full compliance with Rule 402, the factual basis for the plea was set forth by the State's Attorney, the plea was entered, and in the sentencing hearing which followed, defendant was sentenced to death.

The evidence introduced at the sentencing hearing showed that the defendant and Paul Bainter, after a day in which they consumed a large quantity of alcohol, late at night drove to State Park Cafe. Bainter went into the cafe to get some food. After he came out, he and the defendant decided to rob the cafe. Although there is some discrepancy concerning whose idea it was to commit the robbery, it was not disputed that the defendant, clothed in Paul Bainter's army jacket with the hood pulled tight around his face, and carrying a gun owned by Bainter,

entered the cafe and announced a holdup. Bainter remained in the car and kept it running. The defendant demanded that the patrons place their money on the tables. As they were complying, he fired one shot each toward the floor and ceiling. He then ordered everyone into a back room. Everyone in the cafe rushed toward the back room except Elsie Wallace, who apparently stopped to pick up her purse. The defendant then fired a couple of shots into the walls before moving within three feet of Elsie Wallace, who was still standing by her table. Terry Wallace, Elsie Wallace's daughter, testified that as she was going into the back room she looked around and saw the defendant shoot her mother twice, in rapid succession, from a distance of three feet. Elsie Wallace died as a result of these gunshot wounds. The remaining patrons of the cafe huddled together in the back room to avoid being struck by stray bullets. A silence led them to believe the intruder had left; however, he entered the room brandishing his gun and demanded more money. When told it was all out on the tables, he started shooting the victims in a methodical fashion. One victim was shot in the face, another in the elbow, another in the left knee and another was shot twice in the breast. The events in the back room took only a matter of seconds. The defendant then left the cafe leaving the money on the tables, and ran to the waiting car. The defendant and Bainter drove away but Bainter determined to return to the cafe to see what had actually happened inside. The police were just arriving at the cafe as Bainter and the defendant pulled into the parking lot. The defendant hid on the floor of the car while Bainter entered the cafe. Bainter was detained by the police but was permitted to leave after approximately an hour. He and the defendant drove to the defendant's house and informed the defendant's wife what had occur-curred at the cafe. The following day, Bainter and his brothers disposed of the murder weapon, and he, the

defendant, and their wives departed on a prearranged trip to Houston, Texas, where the defendant was arrested.

Defendant argues that two due process of law violations of the fourteenth amendment (U.S. Const., amend. XIV) took place: that the prosecutor's actions in seeking the death penalty after defendant's successful motion to vacate his guilty plea evidences prosecutorial vindictiveness and that defendant was inadequately advised of the consequences of withdrawing his guilty plea.

In *North Carolina v. Pearce* (1969), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072, the court forbade the trial court's imposition of a more severe sentence after a defendant secured a new trial on appeal in the absence of new and objective information justifying the sanction increase. In *Blackledge v. Perry* (1974), 417 U.S. 21, 27, 40 L. Ed. 2d 628, 634, 94 S. Ct. 2098, 2102, the court held that defendants were entitled to pursue their statutory right to appeal free from the fear that upon a grant of a new trial a prosecutor would substitute a more serious charge for the original one when the more serious charge was based on the same conduct. The reasoning of these cases has been applied, correctly in our view, whenever a defendant has chosen to exercise any procedural right. *United States v. Thurnhuber* (9th Cir. 1977), 572 F.2d 1307.

The State's argument that any vindictiveness here was cured by the defendant's subsequent voluntary, knowing, intelligent, unnegotiated plea of guilty is clearly meritless. The vindictiveness cases involve defendants who faced more severe sanctions upon convictions entered after the alleged vengeance, pursuant to trials in which guilt on the more serious charge was established. This case involves a defendant who faced a more severe sanction also entered upon a conviction obtained subsequent to the alleged vengeance. The only difference is that this defendant finally recognized the inevitability of his conviction and

entered a guilty plea. We cannot recognize a distinction between these two situations since it would serve only to encourage useless trials in order to preserve a vindictiveness claim. It is not the fact of guilt which is important; nor is it a question of whether that guilt was ultimately acknowledged. It is rather a question of why a prosecutor has sought an increased sanction and whether prophylactic protection is needed against the possibility of prosecutorial vindictiveness.

In *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663, however, the court held, in a 5-to-4 decision, that a prosecutor's threat to seek an additional indictment if the defendant did not plead guilty to altering a forged instrument in the amount of $88.30, in return for a recommended sentence of 5 years in prison, did not result in a denial of due process:

"Defendants advised by competent counsel and protected by other procedural safeguards ´ are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. [Citation.] Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial. [Citations.]

While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable—and permissible—'attribute of

> any legitimate system which tolerates and encourages the negotiation of pleas.' [Citation.] It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty." (*Bordenkircher v. Hayes* (1978), 434 U.S. 357, 363-64, 54 L. Ed. 2d 604, 611, 98 S. Ct. 663, 668.)

The court, however, also noted that "[t]his is not a situation *** where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty." (434 U.S. 357, 360, 54 L. Ed. 2d 604, 609, 98 S. Ct. 663, 666.) It requires no spectacular leap of logic to conclude that under our unique murder statute and given the qualitative difference between death and other penalties, the possibility of a death sentence, if not revealed to a defendant, should be treated for the purposes at hand as an "additional and more serious charge."

*Bordenkircher* teaches that defendants who make knowing, voluntary, and intelligent choices to risk an increased sanction rather than plead guilty pursuant to a plea bargain will be held to that choice. Although death is the most severe penalty, logically the possibility of death does not change this fact. (*Cf. Brady v. United States* (1970), 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463; *North Carolina v. Alford* (1970), 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160.) The legitimacy of this principle, however, depends upon a defendant's knowing, voluntary, and intelligent evaluation of the risks involved. (See generally *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709.) Thus, in *People v. McCutcheon* (1977), 68 Ill. 2d 101, which successfully fore-

shadowed *Bordenkircher,* defendant was on notice of the position he was in prior to the vacation of the plea agreement.

We conclude that the prosecutor here has, without notice, requested the death penalty after defendant's successful invocation of a right afforded by law. It would certainly be contrary to the assumptions underlying Rules 402 and 605 (73 Ill. 2d Rules 402, 605) to assume that the admonition of the trial judge, the dominant courtroom figure, repeated twice at the initial plea proceeding, that the maximum sentence for defendant's crimes was 80 years in prison, had no impact. At this proceeding the State's Attorney took an active role—advising the court several times about the maximum sentences which could be imposed under the different indictment counts. By acquiescing in the trial court's admonition that 80 years was the maximum penalty, the State's Attorney unmistakably adopted that position and notified defendant that death was not a possible penalty for his crimes.

Defendant's answer to a leading question, propounded at the plea-withdrawal proceeding, does not alter our opinion. Defendant's intelligence was indisputably low. His confusion during the cross-examination was noted by defense counsel, a conclusion which was unchallenged by the State's Attorney and apparently concurred in by the trial court, which granted defendant's motion. And it is significant that after this proceeding defendant's fifth attorney requested a psychiatric examination, in significant part because defendant did not understand that he faced a possible death sentence, and that the State's Attorney never opposed this motion.

Since defendant clearly had a right to challenge a guilty plea which was not entered knowingly, voluntarily, and intelligently, we face the issue deliberately left open in *Bordenkircher* and believe that the vindictiveness principles are triggered when a prosecutor without notice

increases the possible sanction severity for no valid reason after the defendant has exercised a procedural right. (See *United States v. Andrews* (6th Cir. 1980), 633 F.2d 449 (*en banc*); *United States v. Velsicol Chemical Corp.* (D.D.C. Sept. 30, 1980), 498 F. Supp. 1255; *United States v. Ruesga-Martinez* (9th Cir. 1976), 534 F.2d 1367; *United States v. Gerard* (9th Cir. 1974), 491 F.2d 1300; *United States ex rel. Williams v. McMann* (2d Cir. 1970), 436 F.2d 103, *cert. denied* (1971), 402 U.S. 914, 28 L. Ed. 2d 656, 91 S. Ct. 1396.) The prosecutor clearly has a stake in discouraging defendants from challenging their guilty pleas. A prosecutor under our death penalty statute also has the means at hand to discourage such challenges by pursuing a death sentence hearing. We think therefore that there is a realistic likelihood of vindictiveness. (Compare *North Carolina v. Pearce* (1969), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072, and *Blackledge v. Perry* (1974), 417 U.S. 21, 40 L. Ed. 2d 628, 94 S. Ct. 2098, with *Colten v. Kentucky* (1972), 407 U.S. 104, 32 L. Ed. 2d 584, 92 S. Ct. 1953, and *Chaffin v. Stynchcombe* (1973), 412 U.S. 17, 36 L. Ed. 2d 714, 93 S. Ct. 1977.) There is also the appearance of vindictiveness, at the minimum to the individual defendant, when a prosecutor changes his mind in the absence of any alteration in the facts other than a defendant's invocation of a right the law plainly affords. Under any test, then, the prosecutor here is required to point out objective facts which justify a change of mind, as well as to put the defendant on notice prior to withdrawal of his plea what he will face.

The State has not done this here. The prosecution's reasons for seeking the death penalty were stated on two occasions: in closing argument at the sentencing hearing and again at the hearing on defendant's motion to vacate the plea of guilty and the death sentence. In closing argument the prosecutor, quoting from Shakespeare, confessed that he had been "too kind and meek" with defendant in his

earlier agreement and that he was wrong not to seek the death penalty before. At the post-sentencing proceeding the prosecutor contended that the defendant understood the risks he faced when he moved to vacate the plea, since the State was not bound by its plea negotiation, and that defendant understood what motivations the State "might have had" in saving taxpayer resources or that any reservations the State "might have had" about the quality of its evidence would be absent were the defendant to successfully vacate his guilty plea. Professions of mistake fall short of the objective facts necessary to allow a change of mind or put a defendant on notice. (*United States v. Andrews* (6th Cir. 1980), 633 F.2d 449 (*en banc*).) Likewise, the prosecutor's statements regarding the conservation of tax dollars and the reservations he "might have had" before about the evidence are inadequate. (*Cf. North Carolina v. Pearce* (1969), 395 U.S. 711, 726, 23 L. Ed. 2d 656, 670, 89 S. Ct. 2072, 2081.) The State, in its brief, moreover, has not argued that new and objective information unavailable when the original plea was entered justified a new decision to seek a death penalty.

If it were shown on the record in this case that the prosecutor informed defendant from the start that the death penalty would be sought if defendant did not plead guilty, had defendant subsequently pleaded guilty, and then had defendant reneged on that bargain, we would not prevent prosecutors from again seeking to execute him. But the due process clause of the United States Constitution now requires rules which will prevent a vindictive prosecutor from punishing a defendant for doing something the law allows him to do. Undoubtedly prosecutors will be prevented by these rules from undertaking some actions motivated by a good-faith concern for the public weal. Thus we do not say that this prosecutor necessarily was vindictive.

We do say, however, that Rule 402 was not made to

be disregarded. The record here shows that, prior to defendant's challenge of his guilty plea, he was told by the State and the court that he could receive a maximum sentence of 80 years in the penitentiary. No evidence has been offered explaining how these affirmative misrepresentations, if that is truly what they were, were cured. After defendant invoked his right to challenge his plea, therefore, he was placed in the position he was told he occupied previously and is eligible to receive a maximum sentence of 80 years in jail.

By analogy to Rule 605(b)(4), defendants henceforth should also be advised whether the State will seek the death penalty upon the withdrawal of a negotiated guilty plea. When trial courts perform the functions mandated by Rules 402 and 605, they forestall "proceedings that seek to probe murky memories" (*Boykin v. Alabama* (1969), 395 U.S. 238, 244, 23 L. Ed. 2d 274, 280, 89 S. Ct. 1709, 1713) and proceedings like this one, where this court was asked to infer that a defendant of low intellect was correctly advised on the flimsy basis of a solitary monosyllabic affirmation during a cross-examination.

Lastly, the defendant pleaded guilty to both armed robbery and conspiracy to commit armed robbery. Under Illinois law, a defendant cannot be convicted of both the inchoate and the principal offense. (Ill. Rev. Stat. 1977, ch. 38, par. 8—5.) The State agrees that the defendant's conviction for conspiracy to commit armed robbery should be vacated.

The sentence and conspiracy conviction are vacated and the cause is remanded to the circuit court for the imposition of a sentence not greater than 80 years in the penitentiary.

*Affirmed in part and vacated*
*in part; cause remanded,*
*with directions.*

MR. JUSTICE RYAN, concurring in the decision:

Although I concur in the result reached in the court's opinion, I cannot agree with the reasoning supporting that result. I specifically do not agree that our Rule 402(a)(2) was violated prior to the defendant's first plea of guilty. That rule requires only substantial compliance. Since the plea was a negotiated plea and the State had not requested the death penalty, the defendant was properly admonished as to the maximum penalty that could be imposed (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(1)). I also do not believe that due process required that the defendant be admonished that the State would seek the death penalty if the defendant withdrew his negotiated guilty plea. If the original admonishment under Rule 402 was defective, the defects were not relevant to this case because the defendant was fully and accurately admonished before he entered his nonnegotiated plea of guilty. I do feel that, for the reasons stated below, the defendant's due process right was violated, as well as his rights under the eighth amendment of the Federal Constitution.

The defendant, citing *North Carolina v. Pearce* (1969), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072, and *Blackledge v. Perry* (1974), 417 U.S. 21, 40 L. Ed. 2d 628, 94 S. Ct. 2098, argues that the potential for vindictiveness which accompanied the State's Attorney's decision to ask for the death penalty following the withdrawal of the defendant's original guilty pleas violated the due process clause. However, the State points out that in *North Carolina v. Pearce* and *Blackledge v. Perry,* the defendants had not withdrawn from negotiated pleas of guilty but the increased penalty was requested following the defendants having availed themselves of the lawful methods provided for challenging their convictions. The State cites *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663, in which case the Supreme Court noted that distinction and stated:

"In those cases [*Pearce* and *Perry*] the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power.' *Parker v. North Carolina*, 397 U.S. 790, 809 (opinion of Brennan, J.). \*\*\*

\*\*\* [I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." (*Bordenkircher v. Hayes* (1978), 434 U.S. 357, 362-63, 54 L. Ed. 2d 604, 610-11, 98 S. Ct. 663, 667-68.)

The court held in *Bordenkircher* that due process was not violated when the prosecutor threatened during plea negotiations to have, and subsequently did have, the accused indicted on a more serious charge for not pleading guilty to the offense which was originally charged.

These cases which I have discussed did not involve the death penalty, and for this reason are not helpful in deciding the case now before this court. The death penalty is such a different penalty that the logic and reasoning of the court in applying other penalties are of little help in justifying the imposition of the ultimate penalty. We would not be on sound footing in following the rationale of these cases in determining the due process issue as it relates to the imposition of the death penalty. In considering any case involving the penalty of death, one must look to the rationale of the Supreme Court in deciding the validity of death penalty statutes both on their face and as applied. These cases have generally analyzed and determined the issues presented on the basis of the proscription of the eighth amendment to the Federal constitution;

however, I perceive that a statute, valid on its face, as this court has heretofore determined our death penalty statute to be (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531), could be applied in such a manner as to constitute a due process violation, as well as cruel and unusual punishment proscribed by the eighth amendment. Following the rationale of the Supreme Court in the death penalty cases hereafter discussed, I conclude that the imposition of the death penalty on the defendant, under the facts of this case, constitutes a violation of the due process clause of both the State and Federal constitutions, as well as cruel and unusual punishment proscribed by the eighth amendment of the Federal Constitution. The imposition of the death penalty in this case would constitute an arbitrary application of the statute, unguided by any standards except the whim of the prosecutor.

When the Illinois legislature enacted the current death penalty law for the offense of murder (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(a) through (j)), it specified that the death penalty is a possible sentence only if at least one of seven aggravating factors is found to exist by a judge or jury at a separate sentencing hearing following the defendant's conviction of murder. (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(g), (h).) However, the separate sentencing hearing to determine if the death penalty should be imposed can only be held "[w]here requested by the State." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) Since the request of the State's Attorney is a condition precedent to the imposition of the death sentence, if not requested, the death sentence can never be applied.

Under the facts of this case, when the State's Attorney negotiated a guilty pleas from the defendant in exchange for a 60-year sentence on the murder charge, death was not a possible penalty since it could not be imposed without the State's Attorney's request for a penalty hearing. The prosecutor, having exercised the discretion vested

in him by statute, informed the court, the defendant and the public that death was not an appropriate penalty in this case and the court, by concurring in the negotiated plea, confirmed this conclusion. However, within three months the prosecutor decided that death was an appropriate penalty and requested the penalty hearing, which activated the statutory machinery ultimately enabling the court to sentence the defendant to death. The defendant was the same; the offense was the same; no new evidence had surfaced; and the conviction was obtained in the same way, by a plea of guilty. Now, just three months later, the appropriate penalty, the price tag, for this offense was no longer 60 years, but death. The prosecutor explained to the court: "[A]nd prosecutors, your Honor, make decisions. Somebody has to. And we make mistakes. Mine was in not seeking the death penalty earlier. I was wrong then. I am right now."

If such drastic variances in penalties recommended by the same State's Attorney for the same offense to be imposed on the same defendant can be attributed to a mistake in judgment or evaluation, it is, of course, possible that the latter judgment was the mistaken one, which another evaluation by the State's Attorney would make evident. From the record, it appears that the prosecutor may have changed his mind more than once as to the penalty to be sought. At the sentencing hearing the defendant's counsel, in argument to the court, stated that on June 23, several months prior to the negotiated plea, the State's Attorney told the *News Democrat* he was "going to seek the death penalty" for defendant Walker but probably not for defendant Bainter. The State's Attorney, in responding to the argument of defense counsel, did not deny that he had made such a statement to the newspaper. Later, of course, he recommended a sentence of 60 years, and finally he again sought the penalty of death. In view of this vacillation and the admission of the State's Attorney

that mistakes are made, we naturally wonder if the recommendation of a sentence of 60 years was the result of the prosecutor's conclusion that his prior opinion in June that death was an appropriate penalty was also a mistake. In *Furman v. Georgia* (1972), 408 U.S. 238, 309, 33 L. Ed. 2d 346, 390, 92 S. Ct. 2726, 2762, Mr. Justice Stewart, in a concurring opinion, stated:

> "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."

Borrowing the analogy of Mr. Justice Stewart, I view the imposition or the withholding of the death penalty, depending upon whether or not the prosecutor thinks he made a mistake, as cruel and unusual in the same manner that being struck by lightning is cruel and unusual. It has no rational basis and is founded upon no standards or guidelines. It is purely an arbitrary, capricious and freakish imposition of the penalty, in violation of the eighth amendment to the Federal Constitution and the due process clause of the fourteenth amendment of that constitution and of the Constitution of this State.

*Furman v. Georgia* rendered invalid most State death penalty statutes, following which many States reenacted statutes authorizing the imposition of the death penalty. In 1976 the Supreme Court considered five of those statutes in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960, *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950, *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, and *Roberts v. Louisana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001. A majority of the court found the statutes to be valid in the first three cases while in the last two cases the majority of the court found the statutes did not comply with the eighth amendment requirement. In *Lockett v. Ohio*

(1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, the opinion of the chief justice summarized the holdings of the many opinions filed in the five post-*Furman* cases. The *Lockett* opinion concluded that the court had held in those cases that there is a qualitative difference in the death penalty and punishment in noncapital cases. Although legislatures remain free to decide how much discretion should be reposed in a judge or jury in non-capital cases, this qualitative difference between death and other penalties calls for a *greater degree of reliability* when the death sentence is imposed. The *Lockett* opinion also distilled from the five post-*Furman* cases that all sentencing discretion need not be eliminated but it must be directed and limited so that the death penalty would be imposed in a *more consistent and rational manner* so that there would be a *meaningful basis* for distinguishing the cases in which it is imposed from those in which it is not. In *Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197, the court held that it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, *based on reason rather than caprice or emotion.* I might add to this statement, or mistake.

The mandate of these cases was clearly not followed in this case. Death is a drastic penalty. Its finality demands certainty in that the prosecutor's decision to request a penalty hearing must have a rational basis. His explanation that his previous recommendation of a 60-year sentence was a mistake does not satisfy what the Supreme Court in the above cases has deemed essential. If death was the appropriate penalty in this case, the State's Attorney should not have vacillated but should have sought it following the first guilty plea. Thus, it does not appear that there is a meaningful basis for distinguishing between the imposition of the death penalty on the second guilty plea and the foreclosing of it on the first, when nothing

in the case had changed except that the prosecutor stated he made a mistake.

The reasoning of this case does not necessarily apply to lesser penalties. The Supreme Court of the United States has recognized on several occasions that the guilty plea and the plea bargain are essential components of the country's criminal justice system. (*Santabello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495; *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663.) However, due to the qualitative difference in the death penalty there is a corresponding difference in the need for reliability in determining whether death is the appropriate punishment in a specific case.

It is a denial of due process to subject the defendant facing death to the vacillation of the prosecutor's office as was done in this case. When the prosecutor forgoes his right to seek the death penalty, enters into plea negotiations, and reaches an agreement that is acceptable to him and the court, notions of basic fairness and due process prevent him from seeking the death penalty at a later date absent a change in circumstances beyond a mere recognition that he made a mistake. For these reasons I would hold that the defendant's eighth amendment rights as well as his due process rights were violated in the procedure leading up to the imposition of the death penalty in this case.

MR. JUSTICE MORAN, dissenting:

The opinion of Mr. Justice Clark expressly states:

"If it were shown on the record in this case that the prosecutor informed defendant from the start that the death penalty would be sought if defendant did not plead guilty, had defendant subsequently pleaded guilty, and then had defendant reneged on that bargain, we would not prevent

prosecutors from again seeking to execute him."
(84 Ill. 2d at 525.)

That is exactly what transpired in this case. Therefore, I would affirm the judgment of the trial court.

My colleagues engage in a prolonged discussion of prosecutorial vindictiveness, focusing primarily upon *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663, yet ultimately conclude that the prosecutor in the instant case was not necessarily vindictive. (84 Ill. 2d at 525.) Nevertheless, they find a denial of defendant's due process rights because the improper initial admonition led to defendant's unawareness that the State could seek the death penalty following withdrawal of the first guilty plea.

In *Bordenkircher,* the State prosecutor carried out his threat made during plea-bargaining negotiations to seek an additional indictment if the defendant did not enter a guilty plea to the forgery offense with which he was originally charged. The Supreme Court first determined that *North Carolina v. Pearce* (1969), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072, and *Blackledge v. Perry* (1974), 417 U.S. 21, 40 L. Ed. 2d 628, 94 S. Ct. 2098 (cited by my colleagues in this case), were inapplicable because those cases involved "the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining power.' [Citation.] " (*Bordenkircher v. Hayes* (1978), 434 U.S. 357, 362, 54 L. Ed. 2d 604, 610, 98 S. Ct. 663, 667.) The court then analyzed the plea-bargaining process noting that "[d]efendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condem-

nation." (434 U.S. 357, 363, 54 L. Ed. 2d 604, 611, 98 S. Ct. 663, 668.) The court's holding was narrow:

"We hold only that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment." 434 U.S. 357, 365, 54 L. Ed. 2d 604, 612, 98 S. Ct. 663, 669.

As my colleagues point out, the court excluded from its consideration the situation where the State brings an additional and more serious charge without prior notice after a defendant insists on pleading not guilty following plea negotiations pertaining only to the original indictment. This exclusion, taken in conjunction with the narrow holding, means only that the opinion, as it relates to prosecutorial vindictiveness, does not pertain to a situation where the State brings a more serious charge that it did not confront defendant with during the course of plea negotiations.

Even if the inference is correct that this latter situation would result in a finding of prosecutorial vindictiveness (see footnote 5 of the *Bordenkircher* opinion, where the court specifically passes no judgment on this situation (434 U.S. 357, 360 n.5, 54 L. Ed. 2d 604, 609 n.5, 98 S. Ct. 663, 666 n.5)), the circumstances in the instant case are distinguishable from those encompassed by the exception. The record nowhere indicates that the State sought a penalty that was not brought to defendant's attention during the course of plea negotiations. Moreover, the holding in *Bordenkircher,* as well as the exclusion language, confines itself to the State's seeking an additional and more serious charge. Although my colleagues find "[i]t requires no spectacular leap of logic" (84 Ill. 2d at 522) to analogize seeking a different and more serious charge

to seeking a more serious sentence, I find *Bordenkircher* does not provide an adequate foundation from which to launch the leap they do make, nor is any additional authority cited. Finally, *Bordenkircher* focuses on prosecutorial conduct prior to the entry of a plea—it does not address the issue of withdrawal of a guilty plea.

Further, I disagree with the conclusion that, as a result of the trial judge's improper admonishment, defendant was unaware the death penalty was a possible consequence at the time he withdrew his first guilty plea. At that time, on December 7, the following exchange took place between the State's Attorney and defendant:

"Q. As part of that [the negotiated guilty plea], we—
you knew also that the death penalty was not going to be
sought, didn't you, you would be going to jail rather than
looking at a potential death penalty; didn't you?
A. Yes."

My colleagues state that defendant's low intelligence and confusion preclude giving credence to the preceding dialogue, in light of the original improper admonition. Yet, at the hearing to withdraw the original plea of guilty on December 7, defendant's attorney in no way indicated that any confusion experienced by the defendant pertained to that specific exchange or that any confusion was attributable to the improper admonition. I also disagree with the statement of my colleagues that by "acquiescing" in the trial court's admonition that 80 years was the maximum penalty, the State's Attorney "notified defendant that death was not a possible penalty for his crimes." (84 Ill. 2d at 523.) My colleagues prefer to reach this strained conclusion rather than rely on plaintiff's response when the above specific question was posed to him.

Additionally, when defendant asked the trial judge to withdraw his first guilty plea, defendant was represented by counsel, who appeared in court on November 20 and stated that defendant's motion to vacate the guilty plea

was against his advice. It is not unreasonable to assume that, as part of this advice, counsel notified defendant he could receive the death penalty. At that time, defendant dismissed his counsel and the court appointed the public defender to assist defendant in a motion to withdraw his guilty plea. My colleagues give no indication that the motion to withdraw was made because the maximum penalty that could be imposed was an 80-year prison term. Incidentally, during the course of the proceedings, defendant was represented by and received the advice of five different attorneys.

Collectively, these factors do not indicate to me that, at the time defendant withdrew his guilty plea, he was unaware that death was a possible consequence. This court has stated that " '*** [T]he petitioner must bear the burden of showing that the circumstances as they existed at the time of the plea, judged by objective standards, reasonably justified his mistaken impression.' " (*People v. Hale* (1980), 82 Ill. 2d 172, 176, quoting *United States ex rel. Curtis v. Zelker* (2d Cir. 1972), 466 F.2d 1092, 1098.) In the present case, the defendant has not met the burden to justify any misconception.

In this case, the judge gave an improper admonition at the time of the first guilty plea. The judge, however, allowed defendant to withdraw that plea, thereby nullifying any improper admonition previously given. The granting of the motion to withdraw placed defendant in the same position as if the original negoitated plea had not occurred. Subsequently, the defendant realized, in the words of my colleagues, "the inevitability of his conviction" and on February 6, before another judge, entered an unnegotiated plea of guilty to each indictment count. The trial judge's extremely thorough admonishment was in full compliance with Rule 402. (73 Ill. 2d R. 402(a)(2).) The latter admonition reveals that the plea was not entered under the misconception that the terms of the plea agree-

ment were still in effect. Indeed, the defendant repeatedly demonstrated his awareness that the death penalty was a possible consequence of the second guilty plea. Nevertheless, defendant persisted in pleading guilty.

Under the circumstances surrounding this case, I do not believe defendant's due process rights were violated.

UNDERWOOD and WARD, JJ., join in this dissent.