THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN E. SANDERS, Defendant-Appellant.

Fourth District   No. 4—89—0530

Opinion filed June 7, 1990.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Nancy Owen, State's Attorney, of Charleston (Kenneth R. Boyle, Robert J. Biderman, and James Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

A Coles County jury returned verdicts finding defendant John E. Sanders guilty of the offenses of residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3) and theft over $300 (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 16—1(a)(1)). On May 10, 1989, the circuit court entered judgment on the verdict finding him guilty of residential burglary. The court determined theft to be an included offense of residential burglary, and it dismissed that charge. The court subsequently sentenced defendant to a maximum, extended-term sentence of 30 years' imprisonment.

Defendant now appeals, contending (1) the State failed to prove him guilty of residential burglary beyond a reasonable doubt; (2) improper and inflammatory comments made by the State during closing arguments deprived him of a fair trial; (3) he was improperly penalized for exercising his constitutional right to a trial by jury; and (4) the trial court erred at sentencing when it failed to consider certain

mitigating factors which were present. For the reasons hereinafter stated, we affirm.

The evidence at trial undisputedly showed that, on September 10, 1988, the residence of Ruth Wheeler in Charleston, Illinois, was burglarized at some time between the hours of 5 and 10:30 p.m. Apparently, the burglar had obtained entry into the home by breaking a sliding glass door with a crowbar taken from Wheeler's garage. The home was completely ransacked, but police officer testimony revealed the police were unable to uncover any physical evidence, including fingerprints, from the scene of the crime.

Wheeler testified she found numerous pieces of jewelry missing that evening, and she described those missing items to the police. During trial, the State showed Wheeler various pieces of jewelry labeled exhibit Nos. 7 through 38. Wheeler identified all 31 pieces of jewelry as her own. She further stated she had previously identified those items when the police brought them to her for identification in late September 1988. As we later explain, these items had previously been recovered by the police from a van in which defendant was a passenger.

Anthony Madison, also known as Rasheed, testified he lived next door to defendant in a trailer park during the fall of 1988. Testimony later revealed that trailer park was located in Charleston. Madison stated that, on September 28, 1988, he had a conversation with defendant during which defendant told Madison defendant "had to get out of town soon." Madison said defendant told him he had some "things," and he wondered if Madison "could use or *** wanted to buy" those items. Madison said defendant then showed him some jewelry which he had retrieved from a gray, nylon gym bag with a shoulder strap. During trial, Madison identified some of the jewelry which Wheeler had previously testified belonged to her as part of the jewelry defendant had tried to sell to him on that date.

Madison further stated that, when he asked defendant where he had gotten the jewelry, defendant responded it was "some stuff he [had] picked up from something he had hit, a place he had hit." He stated defendant mentioned the place "was in town." Madison indicated he was familiar with the phrase " 'to hit' a place," and understood it to mean breaking into a place or stealing from a place. Madison said he told defendant he did not think he could use the jewelry at that time but would talk to him later.

Madison said that, following this conversation with defendant, he spoke with one of his neighbors, Peggy Hayes, and then decided to talk to the police at Eastern Illinois University. He stated he briefly

described to them some of the items of jewelry defendant had shown him. He said the police instructed him to meet again with defendant and see if he still wanted to sell the jewelry in question. Police officer testimony corroborated these arrangements.

Madison testified he did, in fact, meet with defendant and another person, Mike Collins, outside his trailer later that same day. Madison admitted he did not actually see any jewelry at that time but stated defendant indicated he had the jewelry with him in a bag he was holding. At trial, Madison identified the bag which defendant had in his possession on that evening as State's exhibit No. 6, a purplish velvet bag with a Crown Royal insignia on it.

Madison said he told defendant they were going to meet up with another person who was interested in buying the jewelry from him, when, in fact, the police were going to be present at that location and ready to arrest defendant. Madison stated the plan failed when Collins saw the police and alerted defendant, and defendant ran from the scene. During his testimony, Madison admitted he had pleaded guilty in 1988 to a misdemeanor charge of deceptive practices.

Defendant testified Madison was the one who approached him on September 28, 1988, and at that time Madison asked him if he knew anyone who would be interested in buying some cocaine. Defendant said he later observed police in the area and thought Madison was "trying to set [him] up on a drug deal." He denied ever offering to sell jewelry to Madison.

John Fasig testified he had a conversation with defendant on September 29, 1988, during which defendant told him "[h]e [wanted] a ride to Mattoon so he could get some money to avoid arrest to get out of town." Fasig said he knew there was a warrant out for defendant's arrest, and he wanted to make some extra money, so he contacted the police and told them he knew where defendant was located. He said he made arrangements with the police to have defendant arrested.

Fasig stated he agreed to take defendant to Mattoon. While he was waiting in his van, he observed defendant exit one trailer and enter another with a gray satchel-type gym bag in his possession. He said he then watched defendant leave that trailer with no bag in his hands. Fasig said defendant got into his van and sat in the right passenger seat.

While they were en route to Mattoon, the police stopped Fasig's van as previously arranged. Fasig said that, as the police stopped him, he observed defendant go into his back pocket and retrieve a bag out of it. He said he watched defendant stick the bag into the side compartment of the van. He identified the State's exhibit No. 6, the

purplish velvet Crown Royal bag, as the bag he saw defendant stick into the passenger compartment. Fasig also generally identified the 31 pieces of jewelry as "stuff that was dumped in the floorboards of [his] van." He maintained he had not had the jewelry in his possession and had not ever seen it until the police "arrested" him and showed him the items in his van. He further stated he had not seen the Crown Royal bag prior to that time.

Defendant testified Fasig had approached him on September 29, 1988, and asked defendant if he would like to accompany him (Fasig) on a drive to Mattoon. He said he agreed to go along with Fasig and was subsequently arrested when the police stopped Fasig's van. He maintained he was not familiar with the purple Crown Royal bag or the jewelry found inside of it.

Charleston police officer Joseph VanGundy corroborated Fasig's testimony concerning the discovery of the jewels in Fasig's vehicle. He indicated the police discovered jewelry in the passenger-side door pocket, along with the State's exhibit No. 6, the Crown Royal bag. He also stated jewelry was discovered lying on the floor behind the passenger seat. He admitted no jewelry was found on defendant's person.

VanGundy stated he gathered up all of the jewelry he found in the van, exhibit Nos. 7 through 38, placed the items in the Crown Royal bag and took them over to Wheeler's home for her perusal. VanGundy impeached the testimony of Wheeler to some extent when he stated Wheeler was only able to positively identify 9 of the 31 pieces of jewelry as her own.

Peggy Hayes testified on behalf of the State that she had seen defendant with a bag of jewelry in his possession, and he had given her a pinky ring before the end of October 1988. Wheeler identified the pinky ring as one of her rings which was missing from her home after the September 10, 1988, burglary.

During his case in chief, defendant called two of his friends, Linda Fitzgerald and Jerry Lee Gordon, Jr., as witnesses. Both testified they had been with defendant during at least part of September 10, 1988, the date the burglary occurred. Defendant corroborated this testimony. Another friend, Peggy Hayes, said she recalled a day when defendant and Gordon were together in her trailer from 4 until 11 p.m. but could not remember the exact date.

Elaine Powell, another of defendant's friends, testified that, around September 18, 1988, she saw Madison and Fasig conversing in the trailer court and then observed Madison hand Fasig a lumpy purple bag. However, her testimony was undercut when she incorrectly

identified those men from photographs she was shown.

Defendant now maintains on appeal that the foregoing evidence was insufficient to support a finding of guilty of residential burglary beyond a reasonable doubt. He emphasizes the absence of any evidence placing him at or within close proximity of Wheeler's residence around the date of the offense, as well as the absence of any physical evidence from the crime scene itself.

To support his contention, defendant mainly relies upon *People v. Phoenix* (1981), 96 Ill. App. 3d 557, 421 N.E.2d 1022, and *People v. Johnson* (1981), 96 Ill. App. 3d 1123, 422 N.E.2d 19.

In *Phoenix*, the evidence showed the police observed two defendants and another man remove a rototiller from a car and place it on the porch of a building at 3 a.m. When questioned by the police, the three males initially denied any knowledge of the rototiller. Defendant Joseph Phoenix later stated he and the other two men had purchased the rototiller for $10 at about 1:15 a.m. from a man named Pedigo. Pedigo corroborated this statement. The victim testified she noticed the rototiller missing from her storage shed at 4:50 a.m. on that same date and subsequently identified the rototiller found on the porch as her own.

In *Johnson*, the evidence showed a woman's apartment was burglarized while she was away one weekend, and personal property valued at $1,200 was taken. The woman initially thought her landlord had taken her property because she was in arrears on her rent payments, but her landlord denied any knowledge concerning the missing items. When an acquaintance informed the woman the next day that her property was being sold out of a van in Freeport, Illinois, the police investigated and pursued the driver of the van when he fled. The police subsequently arrested defendant, the driver of the van, and discovered a small amount of the woman's items still remaining in the van.

In each of the foregoing cases, the appellate court reversed burglary convictions but upheld theft convictions entered against the defendants. Under certain circumstances, a fact finder can infer from a defendant's possession of property recently taken in a burglary that the defendant is guilty of that burglary. (*People v. Housby* (1981), 84 Ill. 2d 415, 420 N.E.2d 151.) However, the courts in both *Phoenix* and *Johnson* concluded the *Housby* inference was not available under the circumstances present in the case, and the evidence failed to support the burglary convictions.

■ We, too, conclude the *Housby* inference is not available here, for defendant's possession of the items taken from the Wheeler resi-

dence was not *recent*. However, in any event, we hold the evidence was sufficient to support a conviction for burglary absent that inference.

The most crucial difference between the instant case and *Phoenix* and *Johnson* is that, here, the State introduced evidence that defendant admitted he had obtained the items of jewelry, identified by the victim as her own, from a place he had "hit." The witness who testified to that conversation stated he understood the term "to hit" to mean breaking into a place or stealing from a place. Although defendant's possession of the stolen items was not as recent as the possession in *Phoenix* and *Johnson*, we conclude the evidence of his possession, along with his admission, was sufficient to prove defendant guilty of residential burglary beyond a reasonable doubt.

Next, defendant maintains he was denied a fair and impartial trial when the prosecutor argued during closing that defendant suborned perjury in cooperation with other witnesses and that he may have had an accomplice. We disagree.

During closing arguments, the prosecutor stated as follows:

"[O]nce the defendant decides to present evidence, once the defendant decides he wants to testify, then that evidence is also to be considered by you in determining the guilt or innocence of the defendant. And if the defendant tries to lie, *tries to put on a sham*, then that, ladies and gentlemen, can be used against him. The defendant's defense is *a blatant attempt to weave a network of lies*, try to explain everything, try to tie up all the witnesses of the People and get out of this charge, and *to try to flimflam you* into finding him not guilty.

\* \* \*

First of all, [the defendant] tries to use the poor pitiful Elaine Powell. Now, we don't know Elaine's motives. We saw her take the stand and smile at [defendant]. You saw the defendant smiling at her. We know about the lengthy conversations. He talked to her but *we don't know what he is trying to sweet talk her into doing*. You do know when she took the stand she wouldn't look at you directly. She looked sideways at me, focused her attention on [defendant]. He has had several lengthy conversations with Elaine. She admitted to that. Early in January. He is getting ready for trial, I might add, in early January, which is approximately four months after September, and *they concoct a story*.

\* \* \*

She is simply *trying to make up a story to try to tie up what*

*the defendant knew was the testimony in the case and to lie to you* too, again, try to get him out of this offense." (Emphasis added.)

Also, in rebuttal closing arguments, the prosecutor stated:

"[Elaine Powell's] testimony does not raise a reasonable doubt as to the defendant's guilt. In fact, it raises strong evidence again of a *fabricated defense by this defendant to try to get his friends together to remember things in such a way* that it will help him out of this charge.
\* \* \*

This defendant has every reason—again, I would not want to imply that [defense counsel] would be doing anything improper in defending his client. He has to go with the evidence and what his defendant tells him has happened and what the defendant's friends tell him has happened. But [defendant] has every reason *to attempt to concoct this false story to attempt to get his friends, Jerry and Elaine[,] to testify to what he wants them to remember as happening* because he is trying to get out of being convicted. \*\*\* None of [the State's witnesses] have any motive in lying, ladies and gentlemen of the jury, and I think you would weigh that in reviewing their testimony; whereas, *the defendant and his good friends* Jerry, good friend Elaine, *have reasons to lie, have reasons to try to remember something perhaps not exactly as they remember it. If John tells them it happened that way, they will remember it and come up here and testify for you* \*\*\*." (Emphasis added.)

Defendant contends these repeated comments by the State concerning defendant's attempts to "put on a sham" and to work with his friends to "concoct a story" were improper because they were unsupported by the evidence and served only to arouse the jury's antagonism against him. Defendant cites a number of appellate and supreme court cases to support his contention.

However, in each of the cases cited by defendant, the State in closing accused the defendant's *counsel* of engaging in defense trickery. The courts found this tactic objectionable partially because it drew the focus of the jury away from the determination of defendant's guilt or innocence and tended to put the defense attorney on trial. (See *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349; *People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078; *People v. Clark* (1983), 114 Ill. App. 3d 252, 448 N.E.2d 926; *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.) Here, the prosecutor clearly stated she did not mean to imply from her comments that de-

fense counsel had engaged in any impropriety in the defense of his client, the defendant.

■■ However, it is proper for an attorney to comment on the credibility of witnesses so long as it is based on an inference which might logically be drawn from their demeanor or testimony. (*People v. Bratton* (1989), 178 Ill. App. 3d 718, 533 N.E.2d 572; *People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011.) Here, the defense witnesses in question stated they were friends of defendant, and Elaine Powell in particular testified she spoke to defendant on numerous occasions prior to trial. We cannot say the comments by the State were not based on reasonable inferences drawn from the evidence presented.

■■ In the same vein, we are concerned with the prosecutor's statement that "perhaps the defendant and someone else" committed the crime in question, for the evidence is wholly devoid of any suggestion defendant may have had an accomplice. While arguments of this type which are not based upon facts in evidence are improper (*People v. Rogers* (1988), 172 Ill. App. 3d 471, 526 N.E.2d 655), we note the comment was speculative and isolated. Moreover, we do not see any substantial prejudice to defendant arising from the suggestion he may have had an accomplice. We conclude any error from this improper argument was harmless.

Next, defendant claims he was improperly penalized for exercising his constitutional right to a trial by jury because the State made him a pretrial offer of 15 years in prison, but, after he rejected it, proceeded to trial and was convicted, the State sought and successfully obtained a 30-year maximum extended-term sentence. He relies primarily upon *People v. Walker* (1981), 84 Ill. 2d 512, 419 N.E.2d 1167, which is clearly distinguishable from the instant case.

In *Walker*, a defendant initially pleaded guilty to various counts in an indictment in exchange for which the State agreed to recommend a 60-year sentence. The court inaccurately informed defendant of the sentencing possibilities in admonishing him pursuant to Supreme Court Rule 402(a) (73 Ill. 2d R. 402(a)). The court later vacated that plea. On the day of trial, defendant entered an unnegotiated plea of guilty, and the State subsequently sought and obtained a sentence of death.

On appeal, that defendant argued the State violated his due process rights when it sought the death penalty after he had successfully vacated his initial guilty plea. He contended those actions by the State evidenced prosecutorial vindictiveness.

In its plurality opinion, three justices of the supreme court noted

that normally a defendant who knowingly, voluntarily and intelligently chooses to proceed to trial and risk imposition of a greater sanction rather than plead guilty under a plea bargain will be held to the choice he has made. However, in vacating defendant's sentence of death, the plurality concluded the vindictiveness principles set forth in *North Carolina v. Pearce* (1969), 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072, and *Blackledge v. Perry* (1974), 417 U.S. 21, 40 L. Ed. 2d 628, 94 S. Ct. 2098, were triggered when "a prosecutor without notice increases the possible sanction severity for no valid reason after the defendant has exercised a procedural right." (*Walker*, 84 Ill. 2d at 523-24, 419 N.E.2d at 1174.) Furthermore, that court indicated circumstances such as those present there gave "the appearance of vindictiveness *** when a prosecutor changes his mind in the absence of any alteration in the facts other than a defendant's invocation of a right the law plainly affords." *Walker*, 84 Ill. 2d at 524, 419 N.E.2d at 1175.

We refuse to apply the reasoning of *Walker* to the instant case because it involved, first, the penalty of death. Justice Ryan, who concurred in the result reached by the plurality, wrote separately and strictly limited his concurrence to death penalty cases. In addition, *Walker* involved a plea of guilty by the defendant. Before accepting such a plea, the court was required to notify him of his rights, including the maximum sentence prescribed by law. (See 107 Ill. 2d R. 402(a).) The court has no similar requirement to inform a defendant of potential sentences when, as here, he has pleaded not guilty. *People v. Jones* (1988), 174 Ill. App. 3d 794, 529 N.E.2d 66.

The instant case is more analogous to this court's decision in *Jones*, cited in the preceding paragraph. During plea negotiations, the State in *Jones* offered to recommend a 30-year sentence for defendant if he pleaded guilty. Defendant rejected the offer. Following a jury trial, defendant was convicted of numerous offenses. The court then sentenced him to a term of 50 years in prison for the most serious of those offenses, the remainder of the sentences to run concurrently. On direct appeal, this court vacated certain convictions and sentences for reasons not pertinent here but affirmed the remaining convictions and sentences. *Jones*, 108 Ill. App. 3d 880, 439 N.E.2d 1011.

The *Jones* defendant filed *pro se* a petition for post-conviction relief, alleging he was not advised by the court or his counsel that he could receive an extended-term sentence and that the first time he realized he could receive a 50-year sentence was at the sentencing hearing itself. He claimed he rejected the State's offer of a 30-year sentence because he believed that was the maximum sentence he could

receive. The trial court denied defendant's petition.

On appeal, this court indicated the case did not involve the situation present in *Walker* where a defendant pleaded guilty and, in doing so, waived a number of his constitutional rights. Instead, it described the case as one in which the defendant rejected an offered plea and chose to fully exercise his constitutional rights but later complained about "being held to his choice" and "the sentence received." (*Jones*, 174 Ill. App. 3d at 798, 529 N.E.2d at 69.) In affirming the trial court's decision, this court concluded the court was not obligated to inform a defendant who pleaded not guilty of potential sentences, and defendant's constitutional rights had not been violated due to the alleged failure of his counsel to advise him of the possibility of an extended term.

■ We specifically reject defendant's argument that some explanation should be required of prosecutors whenever a sentence they recommend to the court after trial exceeds a sentence they were willing to agree to as a part of a plea agreement. The imposition of such a requirement could seriously damage the process of plea bargaining, a process which has been specifically approved by both the United States Supreme Court and the Illinois Supreme Court and which may underlie as much as 80% of criminal convictions in this State. *Of course* defendants are going to be offered an incentive to plead guilty, usually by way of a reduced sentence. There are not many defendants who plead guilty solely to facilitate the criminal justice system. The offering of this incentive is neither improper nor *any* evidence of prosecutorial vindictiveness.

■ Citing *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612, defendant makes a related argument that he is somehow entitled to know *precisely* what the prosecutor will recommend if a plea agreement is turned down. We find no support in *Richardson* for this argument, and we reject it, noting that we see no legal difference between a prosecutor's post-conviction sentence recommendation that is one year greater than that offered as part of a plea agreement and a post-conviction recommendation that is 30 years greater. In so noting, we emphasize that prosecutors do not *sentence*, they just *recommend*; trial courts are the sentencing bodies, and they are free to accept or reject, as they see fit, any sentencing recommendations, whether made by the prosecutor or by defense counsel. In the absence of a plea agreement which the court has decided to accept, *no* recommendation by any counsel is in any way binding upon the court.

■ Defendant was free to accept or reject the State's offer. He voluntarily chose the latter alternative with the inherent risk of po-

tential increased sanctions associated with it. He should now be held to his choice.

Finally, defendant contends the trial court failed to adequately consider the applicable statutory mitigating factors in sentencing him. He points to a comment made by the trial court during sentencing that it was "difficult to find mitigating factors that would favor" the defendant. He claims this comment was erroneous because two statutory mitigating factors were, in fact, applicable to his case, namely (1) his criminal conduct neither caused nor threatened serious physical harm to another; and (2) he did not contemplate his criminal conduct would cause or threaten serious physical harm to another. Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—3.1(a)(1), (a)(2).

■ The failure of a court to consider applicable statutory factors in mitigation of a defendant's sentence can result in a vacatur of the sentence and the cause being remanded for resentencing. (*People v. Cooper* (1986), 146 Ill. App. 3d 596, 497 N.E.2d 157.) However, the comments made by the trial court here did not definitively state it found *no* mitigating factors which were applicable and, hence, do not show a complete failure by the court to consider the above-mentioned factors.

For the foregoing reasons, the judgment of the circuit court of Coles County is affirmed.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.