(No. 53482.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LONNIE YATES, Appellant.

*Opinion filed October 25, 1983.—Rehearing denied December 2, 1983.*

504

508

GOLDENHERSH, SIMON, and CLARK, JJ., concurring in part and dissenting in part.

James J. Doherty, Public Defender, of Chicago (Marc Fogelberg and Robert P. Isaacson, Assistant Public Defenders, of counsel, and Thomas Brandstrader for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, and Michael E. Shabat, Joan S. Cherry, and Thomas J. Murphy, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant, Lonnie Yates, was charged by information in the circuit court of Cook County with a July 11, 1977, murder and burglary, in violation of sections 9—1 and 19—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1, 19—1). Following a February 1979 jury trial he was found guilty of both offenses. The State then requested a separate sentencing hearing to determine whether the death penalty should be imposed. After hearing evidence and argument, and then deliberating some 12 to 15 hours, the same jury found the

existence of statutory aggravating factors and that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The trial court entered judgment on the verdict, sentencing defendant to death, and also imposed an extended sentence of 14 years' imprisonment for the burglary. The death sentence was stayed by the trial court (73 Ill. 2d R. 609(a)) pending this automatic direct appeal (Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i); 73 Ill. 2d R. 603). Defendant attacks his convictions and sentences on numerous grounds, alleging errors at each stage of the proceedings.

On the morning of July 11, 1977, the 17-year-old victim, Veronica Lee, was bludgeoned and stabbed to death in her second-floor apartment in the city of Chicago, where she lived with her mother, Samestine Yancy. The evidence indicated that the assailant had gained entry to the apartment by removing the screen on the rear door and by removing a square of glass from the inner door. Mrs. Yancy had gone to work at 6:30 a.m. that morning, and at approximately 9:30 a.m., Veronica's unclothed body with large scissors embedded in her chest was found in her bedroom closet by her cousin, Timothy Lee, and his friend, Larry Hope. Moments before discovering the body, as the young men approached the second-floor landing on the rear stairwell of the building, they observed a man, whom they later identified in a lineup and in court as defendant, descending the stairwell at a medium pace, while wiping his hands on a white handkerchief or towel.

An autopsy revealed numerous head lesions and numerous stab wounds to the victim's chest and arm; the scissors had penetrated her heart. Human blood was found underneath her fingernails. Mrs. Yancy's iron was found blood-stained with a broken handle near her daughter's body, Veronica's television set was found on

her bed, and her mother's radio, which, it was later established, had been located in another bedroom and dusted two days before, was found on the kitchen table with its cord wrapped around it. Veronica's wallet was found with the contents strewn about a cocktail table. Mrs. Yancy testified that approximately $17 was missing.

Defendant was arrested four days later, on July 15, at the home of a relative with whom he had been staying since July 12. Following a hearing, the trial court denied defendant's pretrial motion to quash his allegedly illegal arrest and to suppress the identification testimony of Timothy Lee and Larry Hope as the fruits thereof, a ruling which defendant challenges here under *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

The State contends that the *Payton* issue as well as other arguments presented by defendant are waived because of defense counsel's failure to file any post-trial motions incorporating these alleged errors. The record indicates, however, that an oral post-trial motion was denied, and the State does not assert otherwise. Although our statute provides that a motion for a new trial is to be in writing specifying the grounds therefor (Ill. Rev. Stat. 1977, ch. 38, par. 116—1), we have previously held that "a general oral motion to which the State does not object will preserve for review all errors which appear properly preserved in the record even though not specified in the oral post-trial motion." *People v. Pearson* (1981), 88 Ill. 2d 210, 217, citing *People v. Whitehead* (1966), 35 Ill. 2d 501, 503-04; see also *People v. Flynn* (1956), 8 Ill. 2d 116, 119-20.

In *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, the Supreme Court held that absent exigent circumstances, the fourth amendment, applicable to the States by the fourteenth amend-

ment (*Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684), prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make an arrest. See also *United States v. Johnson* (1982), 457 U.S. 537, 73 L. Ed. 2d 202, 102 S. Ct. 2579 (holding *Payton* retroactive).

Several witnesses were presented by both the State and defendant at the lengthy pretrial hearing, including: four police officers; an assistant State's Attorney; Timothy Lee, age 17 at the time of the hearing; Larry Hope, age 21 at the time of the hearing; and defendant, who testified concerning the circumstances surrounding his arrest and the subsequent station-house events. The officers' testimony concerning the investigation established the following: Timothy Lee and Larry Hope, who were interviewed shortly after the victim's body was discovered, described the man whom they had seen on the rear stairwell of the building as a dark complected 25 to 35 year old black man, with a mustache and a scar over his left eyebrow, approximately 5 feet 7 inches tall, 175 pounds, wearing a rust-colored suit. The witnesses also met with a police artist who prepared a composite sketch of the suspect which subsequently appeared in the Chicago police department's daily bulletin. A crime scene technician photographed the scene of the crime, secured physical evidence, and dusted a number of areas and items, including the radio from which latent fingerprints were lifted.

On the morning of July 15, the police department received an anonymous telephone call from a woman who stated that Lonnie Yates was responsible for the murder of the young girl on Franklin Boulevard. The caller, who refused to identify herself, also stated that defendant's wife's name was Hatti Smith. After this information was related to Officer Daniel Darcy, one of the investigating officers, he reviewed the burglary unit files and discov-

ered that defendant was on probation for a 1976 burglary. The information contained in the file revealed that the burglary for which defendant had been convicted occurred within a mile of Veronica Lee's apartment, at approximately 11 a.m., and that entry had been gained by breaking the window of a rear door.

Later that afternoon, after arranging for a fingerprint analysis, Officer Darcy was told by a police department fingerprint technician that a latent print from the radio was that of defendant's fingerprint on file with the police department. Officer Darcy then proceeded to the probation department and obtained the address of Hatti Smith from defendant's file. The record reflects that Officer Darcy and his partner located Hatti Smith between 5:30 and 6 p.m., after which she voluntarily accompanied the officers to the police station.

During the subsequent interview, Hatti Smith told the officers that she was defendant's girlfriend and that she had been trying to raise money for defendant, who wanted to leave the State. She indicated that she could probably determine defendant's whereabouts by placing a few phone calls. The officers later heard Hatti Smith refer to the person whom she had phoned as Lonnie and also heard her say that she had some money, but that she was scared because "it was getting hot around here." She subsequently told the officers that she did not know the exact address but that she would point out the house wherein defendant was located.

Between 7:30 and 8 p.m., after Hatti Smith directed the officers to a house on LeClaire Street, the officers drove a short distance to a phone booth and directed her to again phone defendant. Meanwhile several officers drove back to the house. After a few minutes, Officer William Frost radioed from the phone booth that defendant was on the telephone inside the house. The officers stationed in front of the house then approached the front

door, and Officer Michael Cronin, who had arrested defendant on two previous occasions, saw defendant through the opened door. Because the burglar gates were secured on this door, Officer Cronin immediately went to a side door, entered the house and placed defendant under arrest.

Contrary to defendant's position, it is clear from the record that once probable cause developed for his arrest and the police ascertained his whereabouts, there was no deliberate or unjustified delay during which a warrant could have been obtained. (*People v. Winters* (1983), 97 Ill. 2d 151; *People v. Abney* (1980), 81 Ill. 2d 159, 170.) While several factors have been identified as relevant in determining whether exigent circumstances exist, the guiding principle is reasonableness, and each case must be decided on the basis of the facts known to the officers at the time they acted. (*People v. Eichelberger* (1982), 91 Ill. 2d 359, 370; *People v. Abney* (1980), 81 Ill. 2d 159, 173; see also *People v. Free* (1983), 94 Ill. 2d 378, 395; *Steagald v. United States* (1981), 451 U.S. 204, 221, 68 L. Ed. 2d 38, 51, 101 S. Ct. 1642, 1652, and *United States v. Santana* (1976), 427 U.S. 38, 42-43, 49 L. Ed. 2d 300, 305, 96 S. Ct. 2406, 2409-10 ("hot pursuit" of fugitive).) Among the factors that have been considered useful in judging the exigency of a particular situation are that: (1) a grave offense is involved, particularly a crime of violence; (2) the suspect is reasonably believed to be armed; (3) there exists a clear showing of probable cause; (4) there is strong reason to believe that the suspect is in the premises; (5) there is a likelihood the suspect will escape if not swiftly apprehended; and (6) the police entry, though nonconsensual, is made peaceably. (*Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385, 392-93 (*en banc*).) Although we consider these factors relevant, we emphasize, in accord with several other jurisdictions, that the *Dorman* principles should be uti-

lized only as guidelines, not as cardinal maxims to be rigidly applied in each case. (*E.g., State v. Page* (N.D. 1979), 277 N.W.2d 112, 117; *People v. Jones* (Iowa 1979), 274 N.W.2d 273, 275-76, *cert. denied* (1980), 446 U.S. 907, 64 L. Ed. 2d 259, 100 S. Ct. 1833; *United States v. Acevedo* (7th Cir. 1980), 627 F.2d 68, 70, *cert. denied* (1980), 449 U.S. 1021, 66 L. Ed. 2d 482, 101 S. Ct. 587.) Indeed, as some courts have indicated, exigent circumstances may well exist where there is only a serious crime coupled with a reasonable possibility of imminent danger to life, serious damage to property, destruction of evidence, or the likelihood of flight. *E.g., State v. Lloyd* (1980), 61 Hawaii 505, 513, 606 P.2d 913, 918; *Weddle v. State* (Wyo. 1980), 621 P.2d 231, 240; *People v. Ramey* (1976), 16 Cal. 3d 263, 276, 545 P.2d 1333, 1341, 127 Cal. Rptr. 629, 637 (*en banc*), *cert. denied* (1976), 429 U.S. 929, 50 L. Ed. 2d 299, 97 S. Ct. 335.

The police here were investigating a brutal murder, and, as the facts demonstrate, there was a clear showing of probable cause to believe defendant was responsible. In addition, there was strong evidence suggesting that defendant would likely escape if not swiftly apprehended since his girlfriend indicated that she was raising money to enable him to leave the State, and the police thereafter overheard what they might reasonably have interpreted as a tip-off to defendant that the police were hot on his trail. Finally, the arrest was made at a reasonable hour in the evening, and the evidence indicates that, in the circumstances presented, the police entry was made in a reasonable manner. We see no reason why the officers should have conducted a surveillance of the house while a warrant was being obtained, as defendant urges, and arrested defendant on the street had he attempted to leave. Given defendant's probable flight had there been any further delay, such a course of action might well have unnecessarily increased the risk of a violent

confrontation and further endangered the lives of the officers as well as any passersby. (See *State v. Page* (N.D. 1979), 277 N.W.2d 112; *State v. Girard* (1976), 276 Or. 511, 555 P.2d 445; *United States v. Campbell* (2d Cir. 1978), 581 F.2d 22, 26; 2 W. LaFave, Search & Seizure sec. 6.1, at 395 (1978) ("the question of whether a stakeout is or is not feasible is itself a complicated one, and is unlikely to be seen by hindsight in precisely the same way it was perceived by the police on the scene").) We accordingly conclude that the trial court correctly found no constitutional infirmity in defendant's warrantless arrest.

Defendant contends that because of the State's use of its peremptory challenges he was deprived of his constitutional rights under the sixth and fourteenth amendments to a jury representing a cross-section of the community. He asserts that the State used 13 of its 16 peremptory challenges during *voir dire* to excuse blacks. (Defendant is black, as was the victim.) At the time of trial, it was clear that at least one black sat on the jury—the first of the venire to be examined by the trial court; the race of another juror was unclear at that time. Subsequent evidence in a post-trial hearing on defendant's motion for the purpose of establishing that only one black sat on the jury indicated that the other juror in question was probably not black. (The juror indicated that his mother was born in Mexico, he identified his father only by his State of origin, but the juror considered himself white.)

We consider that our recent decisions in *People v. Williams* (1983), 97 Ill. 2d 252, and *People v. Davis* (1983), 95 Ill. 2d 1, are dispositive. (See also *People v. Payne* (1983), 99 Ill. 2d 135.) In light of our treatment of the issue in those cases, an extended discussion here is unnecessary. It is sufficient to note that we held, in accord with the overwhelming majority of courts, that

*Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, continues to be the controlling authority: only a systematic and purposeful exclusion of blacks from the jury, in case after case, raises a constitutional question (*Swain v. Alabama* (1965), 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837; *People v. Williams* (1983), 97 Ill. 2d 252, 273; *People v. Davis* (1983), 95 Ill. 2d 1, 16), and defendant has the burden of producing evidence establishing a systematic exclusion (*People v. Davis* (1983), 95 Ill. 2d 1, 16).We also rejected the argument presented here that the Supreme Court, in *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692, retreated from its earlier holding. We indicated in *Williams* that the limited nature of the *Taylor* holding was clear. As the Supreme Court stated:

> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community ***. Defendants are not entitled to a jury of any particular composition [citation]; but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." (419 U.S. 522, 538, 42 L. Ed. 2d 690, 702-03, 95 S. Ct. 692, 702.)

It is clear that the evidence presented by defendant does not satisfy the *Swain* standard.

We consider next defendant's contention that he was not proved guilty beyond a reasonable doubt. It is, of course, as we have repeatedly recognized, the jury's responsibility to resolve factual disputes, assess the credibility of the witnesses, and determine the weight and sufficiency of the evidence (*People v. Davis* (1983), 95 Ill. 2d 1, 27; *People v. Carlson* (1980), 79 Ill. 2d 564, 583; *People v. Clark* (1972), 52 Ill. 2d 374, 387), and its judgment will not be reversed unless the evidence is so unsatisfactory or im-

probable that a reasonable doubt as to the guilt of defendant remains. *People v. Williams* (1982), 93 Ill. 2d 309, 315; *People v. Lewis* (1981), 88 Ill. 2d 129, 151, *cert. denied* (1982), 456 U.S. 1011, 73 L.Ed. 2d 1308, 102 S. Ct. 2307.

Mrs. Yancy, the victim's mother, testified that she had arisen for work at 5 a.m. on the morning of July 11, 1977. As she ironed her clothing in her daughter's bedroom, she conversed with her daughter, who was dressed in a nightgown. She identified the iron found near Veronica's body. She had left it on the ironing board in the bedroom with its handle intact. The scissors used to kill Veronica were on a cabinet, and the radio had been on a table in Mrs. Yancy's bedroom. Both the screen and the window of the rear door were intact. When Mrs. Yancy left at 6:30 a.m., she instructed Veronica, apparently in accordance with her usual custom, to lock the front door, and she waited outside the door until she heard her daughter do so.

Both Timothy Lee and Larry Hope identified defendant in a lineup and at trial as the man whom they had confronted on the stairwell on the day of the murder. Both witnesses testified, with minor discrepancies, to the following: shortly after 9 a.m., the witnesses, who were searching for a job, went to visit Veronica to borrow carfare. When they arrived at the building, they called out Veronica's name several times, but there was no response. They then threw pebbles at one of her windows, a practice Timothy had used on several previous occasions to gain his cousin's attention, apparently when the outer door at the front of the building was locked or the doorbell was not operating. During this time the witnesses heard screams from the building, but they could not isolate a particular apartment and thought that the screams were those of a child being physically disciplined. After standing outside for approximately 10 minutes, the young men went to the rear of the building, climbed the stairwell and met defendant descending from the second floor while wiping his hands.

Defendant bumped into Timothy, at which point Timothy testified they were staring "face to face"; defendant said, "excuse me," and continued down the stairs at a medium pace. When the witnesses reached the Lees' apartment and saw the condition of the screen and window, Timothy immediately began to chase defendant but lost him at the end of an alley. Meanwhile, Larry had gone into the apartment and discovered Veronica's body. When Timothy returned, Larry, who was visibly shaken, informed him that his cousin was dead. The police were notified and arrived shortly thereafter.

Anna Jean Brown, who occupied the third-floor apartment directly above the Lees, testified that between 9 a.m. and 10 a.m. on the morning of July 11, she heard Veronica's cousin in the front of the building calling out Veronica's name. She walked down the front stairs and knocked on the Lees' door. When there was no answer she returned to her apartment. She then went to her rear outside porch and conversed with her next-door neighbor. While on the porch, she heard Veronica's cousin coming up the stairway. She looked over the bannister and saw a man proceeding down the gangway dressed in an orange two-piece pant suit. She testified that the man was dark complected, 30 to 35 years old, 5 feet 6 inches or 5 feet 7 inches tall, weighing approximately 180 pounds. She did not see his face, however, and consequently was unable to make an identification.

Officer Theatrice Patterson, who had been a fingerprint examiner for over 13 years, and was qualified as an expert, testified that he examined two partially overlapping, identifiable fingerprints which were lifted from the radio found inside the Lees' apartment. A police department lab technician had photographed the prints, and the negative, which was explained as a "one to one of the actual print itself, one to one being actual size," was used for comparison purposes. These prints, as well as the inked impres-

sions of fingerprints, with which they were compared, were later enlarged for demonstrative purposes. Two of the State's experts testified that enlargements of latent prints often lose clarity and are not used for a comparison.

Officer Patterson testified that one of the prints from the radio was Mrs. Yancy's, and the other print was defendant's. In two separate examinations, the officer charted 19 points of comparison between the lifted print and the inked impression of defendant's left thumbprint; there were no dissimilarities. The officer stated that, while there is no standard minimum number of points required, more than 12 points of comparison is never required for an identification.

Officer Herman Kluth, also qualified as an expert in fingerprint analysis, corroborated Officer Patterson's findings. He testified that, based upon his examination, one of the latent fingerprints lifted from the radio was defendant's. He charted at least 12 points of comparison, the spot at which he ordinarily stops when making a corroboration.

The balance of the State's case included testimony from several police officers, the pathologist, and a microanalyst, and physical evidence. That evidence need not be detailed here.

Evidence adduced by defendant included testimony from John Norton, a retired fingerprint examiner from the Chicago police department, who had trained one of the State's experts and who was also qualified as an expert. He had been so employed for 22 years. Mr. Norton, although maintaining that the characteristics should be identifiable on both a good blowup and the one-to-one size, conceded that the blowup of the latent print from the radio which he used was not the proper method of making comparisons. Use of the one-to-one print, he stated, was his standard procedure while he was with the police department, and blowups were used only for demonstrative purposes. He had, however, declined the State's request to

make such an examination at the police lab. In Mr. Norton's opinion, 10 to 12 points of comparison are necessary for an identification, and he was only able to chart three or four points between the photo enlargements of the lifted print and defendant's inked impression.

In rebuttal, the State called Burton Buhrke, also an expert in fingerprint analysis. Mr. Buhrke, who had trained Mr. Norton and who considered that Mr. Norton's reputation in the community was very good, testified that, based upon his examination, the one-to-one print lifted from the radio was defendant's. Although he found more, he charted only 14 points of comparison between the lifted print and defendant's inked impression which he considered "very, very conclusive."

Defendant contends that the identification testimony of Timothy Lee and Larry Hope is entitled to little weight because they had, at the time of the confrontation, neither reason to remember the man they saw nor sufficient opportunity to observe him. Further, he argues that the witnesses' credibility was impeached at trial and that they were influenced by their previous "unreliable" lineup identification. The lineup was conducted under less than ideal circumstances because of defendant's deliberate refusal to cooperate with the police. Defendant concedes that whatever infirmities existed were attributable to his own misbehavior but, nevertheless, submits that the witnesses' in-court identification was, as a result of the lineup, inherently unreliable. We do not agree.

The record indicates that, at the time of defendant's arrest, he was dressed only in short pants and wearing shoes. The officers observed four scratches on defendant's left bicep about one inch apart which appeared, because of partially formed scabs, to be relatively recent. Their attempts to photograph the scabs were frustrated, the testimony indicates, by defendant's constant movement and action in placing his hands over the scratches. Later that

evening, after defendant was taken into custody and questioned concerning Veronica Lee's murder, he was advised that a lineup was going to be conducted. The officers had intended to provide defendant with both a shirt and long pants; however, when they informed defendant that he would be given a shirt, he responded that "he wasn't going to put on a shirt and he wasn't going to stand in a f---ing lineup." The officers then told the other four men chosen for the lineup, who were also in custody, to remove their shirts. After hearing defendant's response, however, they refused, indicating that if defendant would not put on a shirt, they would not remove their shirts. To avoid a physical confrontation in the lock-up, which the officers apparently thought was likely had they forced compliance, and after consulting with an assistant State's Attorney, they placed defendant in the lineup without a shirt. The men were seated on a bench, and the witnesses viewed the lineup separately from a location which precluded a view of the lower portions of the men's bodies; consequently they were unable to observe that defendant was the only man wearing short pants. During the lineup, defendant proceeded to engage in a number of tactics which drew attention to himself. At various times, he covered his face, leaned over, moved around, attempted to stand up, and mumbled.

It seems evident that defendant, who was not unfamiliar with the criminal justice system, sought to destroy or impair the reliability of an identification. It would, however, be little short of ridiculous to hold that because defendant's misconduct during a lineup focused attention upon him, the integrity of a subsequent in-court identification was impaired where that in-court identification would otherwise be satisfactory. One of the principal reasons for lineups is to protect suspects from misidentification and promote the early release of innocent persons. Where, as here, the record shows that the witnesses had an adequate

opportunity to observe defendant on the morning of the murder and make a positive in-court identification, the defendant will not be permitted to challenge its sufficiency because of his own misbehavior. *People v. Broadnax* (1974), 23 Ill. App. 3d 68, 73; see *Appeal of Maguire* (1st Cir. 1978), 571 F.2d 675, *cert. denied* (1978), 436 U.S. 911, 56 L. Ed. 2d 411, 98 S. Ct. 2249.

Defendant also contends that the witnesses' prior description of the suspect to the police and the composite sketch drawn at their direction "seriously impeached" their identification testimony. This contention, like the lineup challenge, is completely unpersuasive. The record indicates that the only dissimilar characteristic between the witnesses' rather detailed verbal description to the police of the suspect and defendant was a minor height variation. The witnesses stated that the suspect was approximately 5 feet 7 inches tall, and the evidence in the record, while certainly not conclusive, seems to indicate that defendant is between 5 feet 9 inches and 5 feet 11 inches tall. In contrast, the witnesses accurately described defendant's approximate age, weight, skin tone, hair style, moustache, and scar above his left eye. The dissimilarities between defendant and the composite sketch, drawn by a police artist who testified that his sketches resemble the person apprehended only one-third of the time, were more marked. Both witnesses, however, testified that they had told the artist that the sketch was not accurate or did not look like the man they saw on the stairs, while the artist testified that to the best of his recollection his interview with the witnesses ended when they were satisfied with the drawing.

It has been repeatedly emphasized that where the evidence is conflicting, it is the peculiar prerogative of the trier of fact to ascertain the truth, and a reviewing court may not substitute a different judgment on questions involving the credibility of the witnesses. (*E.g., People v.*

*Kline* (1982), 92 Ill. 2d 490, 505; *People v. Manion* (1977), 67 Ill. 2d 564, 578, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Hammond* (1970), 45 Ill. 2d 269, 278.) To the extent that the identification testimony of Timothy Lee and Larry Hope might be thought to have been impeached by defense counsel with the use of the sketch and by the testimony of the police artist, it was the jury's responsibility to assess its impact. (*People v. Berland* (1978), 74 Ill. 2d 286, 306-07.) It is clear that the witnesses were unequivocal in their in-court identification of defendant, and the jury was obviously impressed with the strength of that testimony.

While defendant also attacks the credibility of the State's fingerprint experts, it is evident that the jury discounted the testimony of defendant's expert, who conceded that he did not use the proper method in making his fingerprint comparison. The jury heard testimony from both sides concerning whether blowups of fingerprints were as suitable for comparison as the one-to-one photos and impressions, and, again, it was its responsibility to judge the credibility of the witnesses and to ascertain the truth.

Where identification of the accused is at issue, the testimony of a single witness is sufficient to support a conviction, even in the presence of contradictory alibi testimony, provided the witness is credible and viewed the defendant under circumstances which would permit a positive identification. (*E.g., People v. Tate* (1981), 87 Ill. 2d 134, 148; *People v. Manion* (1977), 67 Ill. 2d 564, 578; *People v. Stringer* (1972), 52 Ill. 2d 564, 568-69.) Furthermore, a conviction will be sustained solely on the basis of fingerprint evidence, where a defendant's fingerprints are found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed. (*People v. Rhodes* (1981), 85 Ill. 2d 241, 249; *People v. Taylor* (1965), 32 Ill. 2d 165, 168 (despite the

presence of other "smudged" fingerprints on the window of a burglarized apartment, the unexplained presence of defendant's prints is not consistent with any reasonable hypothesis of innocence); see also *People v. Malmenato* (1958), 14 Ill. 2d 52, *cert. denied* (1958), 358 U.S. 899, 3 L. Ed. 2d 148, 79 S. Ct. 222.) It is apparent here that the testimony of Timothy Lee and Larry Hope identifying defendant as the man they saw fleeing the immediate vicinity of the crime, and the testimony of the State's fingerprints experts establishing that defendant's fingerprint was found inside the victim's apartment, together with the other evidence in the record, were more than sufficient to establish defendant's guilt beyond a reasonable doubt. *People v. Williams* (1975), 60 Ill. 2d 1, 12 (identification testimony of witnesses supplemented with relevant and damaging fingerprint evidence clearly proved defendant guilty beyond a reasonable doubt).

Defendant argues that it was reversible error for the trial court to refuse to admit the police artist's sketch, which was offered for the purpose of impeaching the identification testimony of Timothy Lee and Larry Hope. The State submits that the sketch was properly excluded because defendant did not establish a proper foundation for its admission, and that, alternatively, its exclusion was harmless beyond a reasonable doubt. While we have not previously addressed the question concerning the circumstances under which a composite sketch may be admissible for impeachment purposes, the converse of this situation was considered in *People v. Rogers* (1980), 81 Ill. 2d 571.

In *Rogers,* this court held that the hearsay rule did not operate to bar the admission of a properly authenticated composite sketch to corroborate the in-court identification of the defendant by the prosecuting witness. The prosecuting witness had testified regarding the description of the robber which he gave to the police officer who prepared the sketch and the authenticity of the photocopy, and

stated that it accurately depicted the robber. Further, the police officer testified that the photocopy of the sketch accurately and correctly depicted the composite he prepared at the direction of the prosecuting witness. While we agree with defendant and the decisions of the appellate court which, following *Rogers,* have held that such sketches may be admissible to impeach the testimony of an identification witness (see, *e.g., People v. Johnson* (1982), 109 Ill. App. 3d 511, 515-17; *People v. Lieberman* (1982), 107 Ill. App. 3d 949, 956; *People v. Schmitt* (1981), 99 Ill. App. 3d 184, 186-87; see also *Kostal v. People* (1966), 160 Colo. 64, 414 P.2d 123, *cert. denied* (1966), 385 U.S. 939, 17 L. Ed. 2d 218, 87 S. Ct. 305) the more difficult question for resolution concerns the evidence necessary to establish a proper foundation, a question upon which *Rogers* is not particularly instructive.

The rule emerging from our appellate court decisions is that the evidence must show that the witness previously adopted the drawing as an accurate portrayal of the suspect. As the appellate court in *People v. Schmitt* (1981), 99 Ill. App. 3d 184, 187, aptly observed:

"If the rule were otherwise and did not require the witness to adopt the drawing as an accurate portrayal, an inept artist could cause the witness to be impeached by a drawing which did not reflect the description given by the witness, even though that description may have been accurate. In other words, the artist could make a drawing that was not a likeness and attribute it to the witness, without the witness' having the opportunity to say that it did, or did not, look like the alleged perpetrator. It is also conceivable that a skillful artist could use the Identi-kit technique and yet be unable to produce a likeness. Recognizing that limitations do exist in the Identi-kit procedure, we deem it unsound to set a precedent whereby such sketches could be admitted without prior adoption and confirmation by the person primarily responsible for identification."

The State, relying upon *Rogers,* seems to suggest that

the identification witness must testify in court as to the authenticity and accuracy of the drawing, while defendant seems to suggest that the mere existence of the drawing which was prepared pursuant to the description given by the witness would be sufficient for its admission. Neither view, it seems to us, correctly identifies the relevant inquiry. In *Rogers,* the sketch was being used to *corroborate* the in-court identification testimony of the witness, so it necessarily follows that the witness was required to testify as to the prior description, the authenticity of the drawing, and that it accurately portrayed the suspect. Where, however, the sketch is used for *impeachment* purposes as a prior inconsistent description of the assailant, a simple in-court denial by the witness that he previously adopted the drawing as an accurate portrayal of the subject would, under the State's theory, preclude impeachment. It is thus apparent that, where authenticity has been established, testimony from the person who prepared the sketch which also establishes that the identification witness previously adopted and confirmed it as an accurate drawing is sufficient foundation for its admission despite a denial by the identifying witness that he had agreed to its accuracy. That denial or an explanation from the identification witness is, of course, admissible and relevant in the jury's assessment of the extent to which the drawing is, in fact, impeaching.

We are concerned, however, with the problem addressed in *Schmitt* regarding the inherent limitations of these sketches, particularly when the Identi-kit procedure is utilized. Consequently, we deem it advisable to require unequivocal testimony from the police artist that the drawing not only was a representation prepared at the direction of the witness, but that the witness, after having had an opportunity to view the completed sketch, adopted it as an accurate portrayal of the suspect. See *United States v. Cassasa* (9th Cir. 1978), 588 F.2d 282, 284-85, *cert. denied* (1979), 441 U.S. 909, 60 L. Ed. 2d 379, 99 S. Ct. 2003-04

(trial court properly excluded composite sketch where the testimony was only that the individual features selected by the witness were those most similar to defendant's features of those available for selection).

The trial judge did not consider whether the police artist's testimony was sufficient to establish a foundation for admission of the sketch, ruling that the sketch was inadmissible hearsay. Consequently, we do not have the benefit of a determination by the trial judge, who was obviously in the best position to evaluate the testimony. While both parties present persuasive arguments concerning the sufficiency of the officer's testimony, we are of the opinion that even if we were to accept defendant's position, he has not shown any substantial prejudice. Defense counsel extensively cross-examined the witnesses with the use of the sketch and repeatedly advised the jury of the asserted discrepancies between the sketch and defendant. He vigorously urged during closing arguments that it was a "physical impossibility" that the man the witnesses described was defendant. The jury heard all of this evidence and argument suggesting that the witnesses did not accurately describe defendant to the police artist, as well as the testimony of the witnesses as to why the sketch was not an accurate portrayal of defendant. Too, the jury heard testimony from the police artist that he was unable to depict the dark complected man the witnesses described, and that he exaggerated the pictured scar, so that, in some respects, the sketch was not even an accurate representation of the description given. Admission of the sketch would have added little, if any, to the probative value of the attempted impeachment, and we cannot conceive that it would have affected the jury's assessment of the credibility of the witnesses. Given the compelling character of the evidence, any error here was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

Defendant argues, citing *People v. Bernette* (1964), 30 Ill. 2d 359, that he was denied a fair trial "when the prosecutor brought to the jury's attention that the deceased's mother was left to live alone" by the murder. However, the quoted portions of the record, to which there was no objection, lend no support to the contention that evidence of the deceased's family was elicited solely for its prejudicial value or that it even had such an impact. Mrs. Yancy simply testified that she and her daughter Veronica were the only people that lived in the apartment, after which she established certain facts, to which only she could testify. For example, she identified certain items found in the apartment and testified concerning their location when she left that morning; she testified concerning the condition of the doors and established that money was missing from her daughter's wallet. Further, her testimony was admitted for the purpose of establishing the identification of the decedent. It was plainly admissible for those purposes. (*People v. Free* (1983), 94 Ill. 2d 378, 413-15; *People v. Brown* (1964), 30 Ill. 2d 297, 303.) "Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." (*People v. Free* (1983), 94 Ill. 2d 378, 415.) The State revealed to the jury no more than was necessary to establish its case, and we find no impropriety.

Defendant urges that it was reversible error for the State to introduce evidence of his 1976 fingerprinting because it disclosed that he had previously been arrested. The testimony of the officer who took the prints was admitted to establish a foundation for the testimony of the State's fingerprint experts who made the comparisons. The State again had defendant fingerprinted in 1978, and the expert witnesses testified that they made two comparisons of the latent print with each of the inked impressions of defendant's fingerprints. As we have previously indicated, the State's fingerprint evidence was vigorously disputed by

defendant: counsel not only attacked the suitability of the latent print for comparison, but also elicited testimony suggesting that depending upon the amount of pressure placed by a person when making an inked impression, it was possible for an apparent discrepancy to occur. It is clear to us that the testimony of the officer which was necessary to establish that two comparisons were made based upon two different inked impressions of defendant's prints was highly relevant and admissible evidence. (See *People v. Free* (1983), 94 Ill. 2d 378, 412-13.) We note, too, as the State points out, that following the officer's testimony in which he simply indicated that he had fingerprinted defendant, there were no references either directly or indirectly to a previous arrest, and the jury did not view the 1976 fingerprint card. Finally, even if it could be said that the State should have presented its case without reference to the date defendant was fingerprinted, the possibility that this evidence prejudiced defendant is entirely too speculative to be viewed as reversible error. *People v. Warmack* (1980), 83 Ill. 2d 112, 128-29 (admission of defendant's mug shot bearing an arrest date prior to the offense in question was harmless; allegation of prejudice somewhat speculative); *People v. Butler* (1974), 58 Ill. 2d 45, 49 (vague and indirect reference to a previous arrest for murder held to be harmless; possibility of an effect on the jury was speculative).

Defendant's final allegations of error in the trial itself concern the closing arguments. He contends that the trial court improperly limited defense counsel's argument and that certain prosecutorial remarks denied him a fair trial. Defendant cites four allegedly improper comments by the prosecutor, only one of which was objected to and thus properly preserved for review. *People v. Jackson* (1981), 84 Ill. 2d 350, 358-59.

During the State's rebuttal argument, the assistant State's Attorney stated:

"Now, let's look at the evidence in the case. This is one of the strongest cases that you will ever see or hear about—

[Defense Counsel]: Objection.

[Assistant State's Attorney]: —for the following reasons: There are—

[Defense Counsel]: Objection, Judge.

THE COURT: Overruled.

[Assistant State's Attorney]: There are five people who have testified in this case that directly puts this man, this 32-year old man now, at that location. ***"

We do not agree that the prosecutor's above argument was an improper expression of his personal opinion as to defendant's guilt. (See, *e.g., People v. Monroe* (1977), 66 Ill. 2d 317, 323-24; *People v. Hoffman* (1948), 399 Ill. 57, 65.) It is apparent that the prosecutor, in commenting on the strength of the State's case, limited himself solely to the evidence, and we regard his comments as permissible argument. *People v. Tiller* (1982), 94 Ill. 2d 303, 319; *People v. Burnett* (1963), 27 Ill. 2d 510, 517.

Defendant contends that it was reversible error for the prosecutor to suggest that defendant sexually attacked the deceased without any evidence to support that theory. The comment to which defendant refers was made, without objection, while the prosecutor was attempting to recreate, based upon the evidence, the probable events inside the victim's apartment. The prosecutor stated that it was possible that while defendant was burglarizing the apartment, the victim surprised him, and "it [was] possible that during this course of time the defendant decided to satisfy some other sort of need, some other desire." That would explain, said the prosecutor, why the victim was found unclothed when she was last seen by her mother wearing a nightgown and also why defendant had scratches on his arm on the day of his arrest. In our judgment, this argument was based upon legitimate inferences from the facts and circumstances proved, and was not improper. See *People v. Beller* (1979), 74 Ill. 2d 514, 526; *People v. Wright* (1974),

56 Ill. 2d 523, 531; *People v. Higgins* (1972), 50 Ill. 2d 221, 228.

Both defendant and the State complain of additional portions of the other's closing arguments. Some of the statements now challenged were not objected to and do not rise to the level of plain error justifying circumvention of the waiver rule. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358-59.) It must be plainly apparent that an error is so prejudicial that real justice has been denied or that the verdict of the jury may have resulted from the error before the plain error rule may be invoked. (See, *e.g., People v. Carlson* (1980), 79 Ill. 2d 564, 577; 73 Ill. 2d R. 615(a).) We have examined the complained-of arguments and rulings, which include an undesirable comment by the prosecutor as to what he would have done had the victim been his wife, as well as sustained objections to unsupported and unwarranted defense accusations of improper police and prosecutorial misconduct, and do not regard them as prejudicial. Clearly the trial court correctly precluded defense counsel from representing in his argument that defendant was, at the time of the lineup, unaware of the reason for his arrest when defendant's own testimony during the pretrial proceedings established that he knew the reason for his arrest well before the time of the lineup. See *People v. Payne* (1983), 98 Ill. 2d 45.

Defendant's remaining contention is that the trial judge improperly prevented him from telling the jury that there was no evidence of a confession or admissions linking him to the murder. Defendant points out that the trial judge had denied the pretrial motion to suppress certain statements which were arguably incriminating and that the State simply chose not to introduce those statements. However, the court also allowed the State's motion to preclude defendant from referring to other exculpatory self-serving statements, a ruling which is not challenged here. While defense counsel's argument to which an objection

was sustained may well have been permissible, we do not regard its exclusion here as reversible error. The absence of any evidence of a confession would have been obvious to the jury, whether mentioned by counsel or not, and we cannot agree that defendant was prejudiced by the court's ruling. From our review of the entire closing argument, we conclude that defendant was not denied a fair trial.

Defendant challenges his death sentence on a number of grounds, the first of which is that he was penalized for exercising his constitutional right to a trial. His contention in this regard is almost identical to that which we rejected in *People v. Lewis* (1981), 88 Ill. 2d 129, *cert. denied* (1982), 456 U.S. 1011, 73 L. Ed. 2d 1308, 102 S. Ct. 2307, wherein the prosecutor had offered before trial to recommend a 60-year sentence in exchange for a plea of guilty by defendant.

The record here shows that, prior to trial, defense counsel inquired of the prosecutor whether, in exchange for a guilty plea, the State would recommend a sentence of natural life imprisonment. After consulting with his superiors, the assistant State's Attorney made that offer, but defendant subsequently rejected it. Considering that it was defense counsel who initiated plea discussions concerning whether the penultimate penalty would be recommended in exchange for a plea of guilty, it would be frivolous for defendant to now argue that he did not choose to stand trial with a complete understanding of the possible hazards. (*People v. Lewis* (1981), 88 Ill. 2d 129, 148-49.) Our decisions in *People v. Brownell* (1983), 96 Ill. 2d 167, and *People v. Walker* (1981), 84 Ill. 2d 512, involving prosecutorial vindictiveness are not apposite here. The prosecutor did not renege on his promise after getting what he bargained for (*Brownell*), nor is there any evidence in this record which suggests that defendant was ever misadvised or ever labored under a misconception that death was not a possible penalty for his crimes. (*Walker.*) To the contrary,

throughout the almost 3,000 pages of proceedings prior to the guilty verdict, it is clear that defendant realized that the State would seek the death penalty in the event of a conviction. The State was not precluded from seeking the death penalty after defendant rejected its pretrial offer, nor do these facts establish that defendant was penalized for exercising his constitutional right to a jury trial. *People v. Lewis* (1981), 88 Ill. 2d 129, 148-49.

Defendant argues that, even if properly excluded at trial, the composite sketch prepared by the police artist should have been admissible at the sentencing hearing. He suggests that the sketch was relevant to the mitigating factor of whether "defendant might be innocent." In view of the fact that the jury had already adjudged defendant guilty beyond a reasonable doubt, it is obvious that the composite sketch was not relevant to any issue before the jury at the sentencing hearing. It was properly excluded.

Nor did the trial judge err in holding inadmissible the testimony of numerous experts whom defendant intended to call at the sentencing hearing. Defendant intended to present the testimony of theologians, ministers, wardens, professors, politicians and attorneys, none of whom were personally acquainted with defendant. The witnesses would have testified concerning religious and ethical attitudes toward the death penalty, the nature of execution in the electric chair, and that the death penalty was not a deterrent. As the trial court correctly held, none of this evidence would have been relevant to whether any mitigating factors existed in this case, and it was thus properly excluded. *People v. Williams* (1983), 97 Ill. 2d 252; see *Lockett v. Ohio* (1978), 438 U.S. 586, 604 n.12, 57 L. Ed. 2d 973, 990 n.12, 98 S. Ct. 2954, 2965 n.12 (Burger, C.J., joined by Stewart, Powell & Stevens, JJ.).

We do agree, however, with defendant's contention that portions of the prosecutor's closing argument at the sentencing hearing were so prejudicial as to constitute *per se*

reversible error. While the State attempts to justify some of the prosecutor's more egregious comments as invited reply or characterizes them as harmless error, it is clear to us that they cannot be so regarded.

In rebuttal closing argument, the assistant State's Attorney stated:

"So when [defense counsel] talks about risks, he talks about the risk of putting away a man. Listen, somebody else is going to be found to have done something like that, the real guy. What kind of nonsense is that? On this evidence that you had there is no other guy. There is no innocent guy.

You know, he did it. You already found it. As a matter of fact, it is not beyond a reasonable doubt on this evidence. There is no doubt that this man is guilty. Prints, two eyewitnesses, and the other circumstances in the case. No doubt that this man is guilty.

But, tell you what, I will take that risk. If somebody does come forward a number of years later and says I did it. Of course that really mean anything. [*sic*] Okay. Under these circumstances here. You blame me for that. You blame me if he is unjustifiably convicted. I would take all the responsibility for that myself.

[Defense Counsel]: Objection. It is the jury's responsibility.

THE COURT: The objection will be sustained, and the jury will be ordered to disregard the comment of counsel as to his shouldering the responsibility, the imposition of the death penalty."

The prosecutor then continued:

"But one thing that I will not ask that you will have the responsibility for, ladies and gentlemen, and then I am not going to take any responsibility for, if you send this man to the penitentiary only and I mean this with respect to everyone of you. If you send him only to the penitentiary, which I don't think you should do.

[Defense Counsel]: Objection.

[Assistant State's Attorney]: Which I don't think the facts and the law would — make any sense under the facts and law here.

THE COURT: Overruled.

[Assistant State's Attorney]: If you do that I am not going to take responsibility if somebody—

[Defense Counsel]: Objection, Judge.

[Assistant State's Attorney]: lets this guy out.

[Defense Counsel]: Objection, objection, objection.

[Assistant State's Attorney]: In a short period of time.

[Defense Counsel]: Ask the jury be instructed to disregard that.

THE COURT: The jury is instructed to disregard the remarks of counsel as to his being let out of the penitentiary.

[Defense Counsel]: Thank you.

[Assistant State's Attorney]: And commits another crime.

[Defense Counsel]: Objection. Ask that counsel be admonished to discontinue that line of argument.

THE COURT: The objection is sustained. The jury is instructed to disregard the last remark of counsel. *** The Court is directing that you abandon any further pursuit of this line of argument."

The State insists that the prosecutor did not tell the jury that he would assume responsibility for imposition of the death penalty, but only advised the jury that he would take responsibility if defendant had been unjustifiably convicted. The trial judge obviously interpreted counsel's remarks otherwise, and it is evident that either argument was entirely improper. Nor can we accept the State's position that the prosecutor's argument was a legitimate response to defense counsel's argument in which he told the jury that death was irreversible and that there was always the possibility that an innocent man would be executed. The prosecutor legitimately responded to that argument by telling the jury that they had already found defendant guilty beyond a reasonable doubt. This court's opinion in *People v. Polenik* (1950), 407 Ill. 337, 349, is apposite. In reversing a murder conviction, vacating a death sentence, and remanding for a new trial, the court held: "It is be-

yond the scope of proper argument to suggest that responsibility for a verdict of guilty or a death penalty may be placed upon the State's Attorney. The jury may not avoid the duty to form its own conclusion by taking the word of the prosecutor on the matter of defendant's guilt, or by resolving any doubts it may have by considering the State's Attorney's willingness to assume responsibility. Statements suggesting or inducing it to do so are clearly improper and prejudicial. *People v. Black,* 317 Ill. 603."

While the court can, by sustaining an objection and instructing the jury to disregard an improper remark, ordinarily correct the error (*People v. Carlson* (1980), 79 Ill. 2d 564, 577), we believe that the remarks of the prosecutor here were so clearly prejudicial and improper that they could not be cured by an admonition to the jury. (See *People v. Garreau* (1963), 27 Ill. 2d 388, 391; *People v. Polenik* (1950), 407 Ill. 337, 347.) Although some may disagree, death is generally regarded to be the ultimate penalty, and certainly the result of its execution is irreversible. The legislature has restricted its use to a quite limited group of cases, and vested responsibility for its imposition in the sentencing jury or judge. That unique responsibility cannot be delegated or shared, and the effect of statements indicating the contrary, such as those before us, cannot be assumed to have been completely eradicated by an instruction to the jury to disregard them. The argument so obviously served to diminish the jury's sense of responsibility and mitigate the serious consequences of its decision that, when combined with the other improper comments noted herein, a new sentencing hearing is required. See *People v. Davis* (1983), 97 Ill. 2d 1.

Finally, the prosecutor's opening remarks merit separate consideration. He indicated that it was not easy for him to ask for the penalty the State was seeking. He then told the jury that in his 5½ years as attorney for the People he had never conducted a hearing of that nature, after

which he indicated that this particular case merited the ultimate penalty. Later, he opined that he could not think of a worse crime. This court has consistently held that the prosecutor's expression of his personal opinion as to guilt is improper. (*E.g., People v. Monroe* (1977), 66 Ill. 2d 317, 323-24.) The argument here suggesting that the prosecutor's previous experience was somehow relevant to whether this defendant should be sentenced to death could only have served to inject an improper and irrelevant consideration into the jury's deliberations.

We accordingly conclude that the prosecutor's closing argument improperly diverted the jury's attention from a consideration of the relevant aggravating and mitigating factors in the death penalty hearing and seriously diminished the jury's sense of responsibility. This court's obligation to insure both high procedural standards and to confine sentencing hearings to proper aggravating and mitigating factors requires that, in these circumstances, which are substantially more prejudicial than those in *People v. Davis* (1983), 95 Ill. 2d 1, 48, we vacate the death sentence and remand for a new sentencing hearing. *People v. Davis* (1983), 97 Ill. 2d 1; *People v. Walker* (1982), 91 Ill. 2d 502, 517; see also *People v. Lewis* (1981), 88 Ill. 2d 129, 164-65.

Defendant's convictions for murder and burglary are affirmed; the judgment sentencing defendant to 14 years' imprisonment for burglary is affirmed; the judgment sentencing defendant to death is vacated, and the cause is remanded to the circuit court of Cook County for a new sentencing hearing.

*Affirmed in part and vacated*
*in part; cause remanded,*
*with directions.*

JUSTICE GOLDENHERSH, concurring in part and dissenting in part:

Although I agree with Justice Simon that prejudicial er-

ror requires reversal of the judgment and remand for a new trial, I do not agree with all that is said in his dissenting opinion. For that reason I add these few brief comments.

The refusal to admit into evidence the composite police sketch was, in my opinion, prejudicial error. Officer Steiner testified that Tim Lee and Larry Hope were satisfied that the composite accurately pictured the man they had seen on the stairs. On that basis, it should have been admitted into evidence and been made available for cross-examination of these witnesses by defense counsel.

Even more damaging and prejudicial to the defendant than the failure to admit the police sketch was the argument of the assistant State's Attorney described in Justice Simon's dissent. There is absolutely no basis in the record for the assumption that the attacker attempted to rape the victim. That type of inflammatory argument has been repeatedly condemned and is a sufficient basis for granting the defendant a new trial.

This conviction rests on the testimony of two boys and a disputed fingerprint. The evidence of guilt is less than overwhelming, and the errors were so prejudicial that defendant was denied a fair trial.

JUSTICE CLARK joins in this partial concurrence and partial dissent.

JUSTICE SIMON, also concurring in part and dissenting in part:

I believe that the defendant should receive a new trial and accordingly dissent from the affirmance of the convictions. In contrast to the majority, which is convinced by the "compelling character of the evidence" (98 Ill. 2d at 529), I find this to be a very close case. The only evidence placing the defendant at the scene of the crime comes from two sources: the eyewitness identifications made by the two boys coming up the back stairs, and the disputed finger-

print found on a radio. With so little evidence supporting a conviction, the exclusion of evidence which casts doubt on the credibility of the eyewitness identification is far from harmless. Further, in such a close case, any impermissible argument by the prosecutor assumes greater significance than it would in a case in which the evidence overwhelmingly implicated the defendant.

We have recently restated the standard for harmless error. "Evidentiary errors *** can be labeled harmless only if properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant." (*People v. Carlson* (1982), 92 Ill. 2d 440, 449; see also *People v. Lindgren* (1980), 79 Ill. 2d 129, 141.) The evidence in this case was contradictory, not overwhelming. A combination of errors in the trial requires a reversal of the conviction and a new trial.

The composite police sketch should have been admitted to impeach the eyewitness identifications. The trial judge ruled the sketch to be inadmissible hearsay (98 Ill. 2d at 529), and thus never addressed the question whether a proper foundation had been laid for its admission. This was error. In *People v. Rogers* (1980), 81 Ill. 2d 571, this court held that a police composite sketch was not hearsay when offered to corroborate the in-court identification by a witness and when the witness was present in court and available for cross-examination. The composite was treated as a prior identification and came within a long-recognized exception to the hearsay rule. As long as the identifying witness can be cross-examined at trial, the witness' veracity can be tested and his demeanor observed by the trier of fact.

As the majority recognizes (98 Ill. 2d at 527-28), the same logic applies to the use of a composite sketch to impeach a witness' in-court identification. The reasons for the hearsay rule do not apply since the witness is available at trial for cross-examination. His veracity can be tested at

that time, and his demeanor can be observed by the jury. In this case, both the witnesses who directed the production of the sketch and the police artist who drew the sketch were available at trial.

The majority, however, addresses a concern raised in *People v. Schmitt* (1981), 99 Ill. App. 3d 184, regarding the sufficiency of the foundation required before a sketch can be admitted for impeachment purposes. The requirement imposed by the majority is "unequivocal testimony from the police artist that the drawing not only was a representation prepared at the direction of the witness, but that the witness, after having had an opportunity to view the completed sketch, adopted it as an accurate portrayal of the suspect." (98 Ill. 2d at 528.) Of course, the witness must in some way indicate his satisfaction with the sketch before it can be considered to be "his" identification. The majority opinion does not, however, explain how the witness must "adopt" the sketch. Clearly, there is some margin of error in the Identi-kit process. While the witness cannot be held accountable for the artist's inability or the limitations of the composite method itself, at the same time it would be unrealistic to require the witness to state that the sketch was a perfect likeness. Since the behavior of witnesses varies, the foundation requirements cannot be satisfied in the same way in each case. The trial court will be required to rule on the adequacy of the foundation on the facts of each case.

The majority refers to the "rule emerging" in our appellate courts. (98 Ill. 2d at 527.) This so-called rule is applied to the individual facts of each case, some of which are very different from the facts we face here. For example, in *People v. Johnson* (1982), 109 Ill. App. 3d 511, a foundation for the sketch could not be laid by questioning both the witnesses and the police artist. In *Johnson*, the police artist could not recall the circumstances surrounding the production of the sketch, and the victim did not testify

to any of the discrepancies between the sketch and the defendant's actual appearance. In this case, however, both the artist and the witnesses testified regarding the witnesses' satisfaction or lack of satisfaction with the sketch. The crucial point is that the trial judge in this case failed to rule on the sufficiency of the foundation; the conviction should be reversed for that reason because, as the majority concedes, the trial judge was in the best position to evaluate the differences between the testimony of the identification witnesses and the police artist.

The State's Attorney argues that even if there had been a sufficient foundation, any error in failing to admit the composite is harmless because oral testimony was elicited from the identification witnesses and the police artist describing the composite and pointing out the differences between Lonnie Yates' features and the features pictured in the composite. This argument assumes that oral description is an adequate substitute for a visual display. It is extremely difficult to capture in words either the subtle nuances of a particular feature of an individual or the overall impression left by a portrait viewed as a whole. I believe that the jury, as the trier of fact, should be permitted to make its own determination of how similar the sketch is to the defendant. Presenting the sketch that the witnesses saw to the jury, so that the jury could consider the sketch together with the testimony of the police officer and of the witnesses, assists the jury in assessing the credibility of the eyewitness identifications. The jury can then decide how much weight to give eyewitness identifications; it can perform that function effectively only if it sees the sketch.

In this case, if the members of the jury had seen the sketch, they would have observed that it showed a light-complected man with heavy wrinkles on his forehead and no mustache. Lonnie Yates is dark complected, has no wrinkles, and shortly after the incident had a prominent moustache. The jury should have been allowed to consider

the sketch, along with discrepancies in the witnesses' verbal description and Lonnie Yates' actual appearance, the information provided by the police artist and the witnesses on the stand, the witnesses' demeanor, and all other information bearing on the witnesses' credibility. Exclusion of the sketch improperly prevented the jury from evaluating all of the evidence. Since the eyewitness identifications were extremely important in this case, my view is that the conviction should be reversed and defendant should receive a new trial at which the trial judge can rule whether a sufficient foundation for admission of the composite has been laid.

Because the majority has decided that there will be no new trial as to guilt, the composite sketch should at least be admitted as evidence in the new sentencing hearing. The circumstances surrounding the case are properly considered as a factor in mitigation. Under section 9—1(e) of the Criminal Code of 1961, evidence which is not admissible at trial can properly be considered in a sentencing hearing. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(e).) As I said in *People v. Szabo* (1983), 94 Ill. 2d 327, 369 (Simon, J., concurring), fundamental fairness requires that the defendant receive every opportunity to present relevant evidence to show why he should live. To preclude defendant from presenting this evidence would be a denial of the due process guaranteed by the fourteenth amendment. (*Cf. Green v. Georgia* (1979), 442 U.S. 95, 60 L. Ed. 2d 738, 99 S. Ct. 2150 (exclusion of reliable hearsay at death penalty proceeding was a due process violation).) It will be necessary to repeat much of the testimony for the new sentencing jury, and I believe that the composite should be provided at that time.

The second ground for reversal is the prosecutor's improper suggestion in closing argument that there was a sexual attack on the victim. There is no evidence in the record to support the argument that a sexual attack took

place. The prosecutor defends it as a natural inference from the evidence. That someone was heard screaming shortly before the body was discovered, that the victim had blood under her fingernails, and that the defendant had several recent scratches on his arm did not warrant the argument that there was sexual involvement. These facts are all consistent with a life and death struggle while the victim was repeatedly stabbed with scissors and hit with an iron. The crime occurred in the morning, and the victim has been last seen wearing a nightgown. Although the body, when found, was nude, the victim may have been dressing, or either entering or emerging from the shower at the moment the assailant arrived. The prosecutor's argument was totally speculative and could have served only to inflame the jurors and to unduly prejudice them against the defendant. It is improper for a prosecutor to argue assumptions and statements of fact that are not in evidence. (*People v. Beier* (1963), 29 Ill. 2d 511, 517.) Given the heinous nature of the crime and the paucity of evidence linking this defendant to it, the prosecutor's remarks were particularly offensive and dangerous.

Finally, I must comment on the use of peremptory challenges to exclude a distinct and identifiable group of qualified jurors from a petit jury. The practice was particularly egregious in this case. The prosecution used 13 of its 16 peremptory challenges to exclude black persons. The black prospective jurors excluded were of both sexes and represented a wide range of income and educational levels. Except for their race, they were comparable to the jurors who served in this case. Of all the jurors chosen, only one black served on the jury. He was an individual who worked as an investigator for the Department of Public Aid and might well be suspected by the State to be a person who would favor the prosecution.

The majority follows *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, and requires

that the defendant show a systematic exclusion of blacks from the jury in case after case. I question whether the defendant can ever meet this burden, since only the prosecutor has access to the information needed to prove systematic exclusion. The defendant is black. The prosecutor here excluded virtually the entire group of black jurors. As I stated in *People v. Gosberry* (1983), 93 Ill. 2d 544, 549 (Simon, J., dissenting), this procedure violates the defendant's rights under the State and Federal constitutions to a jury trial—and to equal protection of the laws.

For the above reasons, although I concur in the conclusion that the defendant should receive a new sentencing hearing, I also believe he should receive a new trial.